SCHIEFFELIN & COMPANY *v.* DEPARTMENT OF
LIQUOR CONTROL ET AL.
(12363)
(12364)

FOREMOST-MCKESSON, INC. *v.* LIQUOR CONTROL
COMMISSION OF THE STATE OF CONNECTICUT ET AL.
(12077)
(12078)
(12079)

PETERS, PARSKEY, GRILLO, SANTANIELLO and BIELUCH, Js.

Argued May 4—decision released August 7, 1984

*Robert F. Vacchelli,* assistant attorney general, with whom, on the brief, were *Joseph I. Lieberman,* attor-

ney general, and *Richard M. Sheridan,* assistant attorney general, for the appellant (named defendant).

*Walter B. Schatz,* with whom were *Samuel J. Henderson* and, on the brief, *Alfred F. Wechsler,* for the appellants (defendant Brescome Distributors Corporation et al.).

*John C. Yavis, Jr.,* with whom was *Barry J. Waters,* for the appellee (plaintiff).

*Robert F. Vacchelli,* assistant attorney general, with whom, on the brief, were *Joseph I. Lieberman,* attorney general, and *Richard M. Sheridan,* assistant attorney general, for the appellant (named defendant).

*Lawrence A. Slitt,* for the appellant (defendant Connecticut Distributors, Inc.).

*Morton Siegel,* with whom, on the brief, was *Harold V. Gorman,* for the appellant (defendant Heublein, Inc.).

*Walter B. Schatz,* with whom were *Samuel J. Henderson* and, on the brief, *Alfred F. Wechsler,* for the appellant (defendant Brescome Distributors Corp.).

*James A. Wade,* with whom were *Sally S. King* and, on the brief, *Bonnie J. MacEslin,* for the appellee (plaintiff).

Parskey, J. The consolidated cases involved in these appeals concern the termination of liquor distributorships. The principal questions raised by these appeals are (1) whether Public Acts 1981, No. 81-367 (act) applies to distributorships in existence prior to the effective date of the act and (2) if so, whether the act as so applied is constitutional. The trial court ruled that the act did not apply and therefore did not reach the constitutional issues. We hold that the act does apply and is constitutional.

The plaintiff Schieffelin & Co. (Schieffelin) is an interstate distributor of liquors and wines, which holds an out-of-state shipper's liquor permit issued by the Connecticut department of liquor control (department). The defendants Brescome Distributors Corporation (Brescome) and Eder Brothers, Inc. (Eder), since September, 1980, have been approved distributors of products for which Schieffelin held Connecticut liquor licenses. The plaintiff Foremost-McKesson, Inc. (Foremost) holds various Connecticut liquor and out-of-state liquor and beer licenses. The defendant Connecticut Distributors, Inc. (CDI) is an in-state wholesale liquor distributor, since September 2, 1980, of several brands of wine and liquor for Foremost.[1] The defendant Heublein, Inc. (Heublein), a producer and importer of a variety of alcoholic beverages, and Brescome were permitted to intervene as party defendants in the Foremost action. These appeals arise out of the various proceedings in two separate cases.

---

[1] CDI also held, for more than twenty-four months, a distributorship with Schieffelin, which distributorship Schieffelin purported to terminate. The department ruled that such termination did not comply with the requirements of General Statutes § 30-17. The trial court dismissed Schieffelin's appeal as to CDI and, no further action having been taken, the Schieffelin-CDI matter is not before us.

To put these cases in proper context, a brief legislative overview of General Statutes § 30-17[2] is instructive. Prior to 1971 there were no statutory restrictions on the termination of liquor distributorships. In 1971, by Public Acts 1971, No. 605, the legislature amended General Statutes § 30-17 by adding a provision which prohibited a manufacturer or out-of-state shipper from terminating a twenty-four month distributorship except on one year's notice or at an earlier date for "just and sufficient cause." In 1979, by Public Acts 1979, No. 79-131, the one year notice was deleted leaving "just

[2] "[General Statutes] Sec. 30-17. WHOLESALER PERMIT. TERMINATION OR DIMINISHMENT OF DISTRIBUTORSHIP. (a) (1) A wholesaler permit shall allow the bottling of alcoholic liquor and the wholesale sale of alcoholic liquor to permittees in this state and without the state, as may be permitted by law, and the sale of alcoholic liquors to vessels engaged in coastwise or foreign commerce, and the sale of alcohol and alcoholic liquor for industrial purposes to nonpermittees, such sales to be made in accordance with the regulations prescribed by the department of liquor control, and the sale of alcohol and alcoholic liquor for medicinal purposes to hospitals and charitable institutions and to religious organizations for sacramental purposes and the receipt from out-of-state shippers of multiple packages of still wines and sparkling wines. The holder of a wholesaler permit may apply for and shall thereupon receive an out-of-state shipper's permit for direct importation from abroad of alcoholic liquors manufactured outside the United States and an out-of-state shipper's permit for direct importation from abroad of beer manufactured outside the United States.

"(2) When a holder of a wholesale permit has had the distributorship of any alcohol, beer, spirits or wine product of a manufacturer or out-of-state shipper or their successors or assigns for six months or more, such distributorship may be terminated or its geographic territory diminished upon (A) the execution of a written stipulation by the wholesaler and manufacturer or out-of-state shipper or their successors or assigns agreeing to the change and the approval of such change by the department of liquor control; or (B) the sending of a written notice by registered mail, return receipt requested, by the manufacturer or out-of-state shipper or their successors or assigns to the wholesaler, a copy of which notice has been sent simultaneously by registered mail, return receipt requested, to the department of liquor control. No such termination or diminishment shall become effective except for just and sufficient cause, provided such cause shall be set forth in such notice and the department of liquor control shall determine, after hearing, that just and sufficient cause exists. If an emergency occurs, caused by the wholesaler, prior to such hearing, which threatens the manufacturer's or out-of-state shipper's or their successor's or assign's

cause" as the only basis for terminating such distributorships. In 1981, upon learning that CDI, Brescome and Eder were threatened with termination of their distributorships, the General Assembly, in Public Acts 1981, No. 81-367, further amended § 30-17 by reducing the durational period for "just cause" terminations to six months. In the Schieffelin case, following the sending by Schieffelin of a termination notice to Brescome and Eder, Schieffelin petitioned the department for a hearing, pursuant to General Statutes § 30-17 (a) (2),

---

products or otherwise endangers the business of the manufacturer or out-of-state shipper or their successors or assigns and said emergency is established to the satisfaction of the department of liquor control, the department may temporarily suspend such wholesaler permit or take whatever reasonable action the department deems advisable to provide for such emergency and the department may continue such temporary action until its decision after a full hearing. The department of liquor control shall render its decision with reasonable promptness following such hearing. Notwithstanding the aforesaid, a manufacturer or out-of-state shipper or their successors or assigns may appoint one or more additional wholesalers as the distributor for an alcohol, beer, spirits or wine product within such territory provided with regard to alcohol, spirits or wine products such appointment shall not be effective until six months, and with regard to beer products one year, from the date such manufacturer or out-of-state shipper or their successors or assigns shall set forth such intention in written notice to the existing wholesaler by registered mail, return receipt requested, with a copy of such notice simultaneously sent by registered mail, return receipt requested, to the department of liquor control. For the purposes of this section, just and sufficient cause means the existence of circumstances which, in the opinion of a reasonable person considering all of the equities of both the wholesaler and the manufacturer or out-of-state shipper or their successors or assigns, warrants a termination or a diminishment of a distributorship as the case may be.

"(3) Nothing contained herein shall be construed to interfere with the authority of the department of liquor control to retain or adopt reasonable regulations concerning the termination or diminishing of a distributorship held by a wholesaler for less than six months.

"(b) A wholesaler permit for beer only shall be in all respects the same as a wholesaler permit, except that the scope of operations of the holder shall be limited to beer only; but shall not prohibit the handling of nonalcoholic merchandise. The holder of a wholesaler permit for beer only may apply for and shall thereupon receive an out-of-state shipper's permit for direct importation from abroad of beer manufactured outside the United States."

on whether Schieffelin had just and sufficient cause for the terminations. The department decided that Public Acts 1981, No. 81-367 was applicable to these terminations and that since the termination notice did not set forth the cause of termination as required by the act, the notice was invalid and therefore ineffectual to accomplish its intended purpose. On Schieffelin's appeal to the Superior Court, that court ruled that the act did not apply retroactively to the terminations in question and sustained the appeal, from which the department, Brescome and Eder have appealed to this court.

Following the sending of a termination notice to CDI, Foremost, pursuant to General Statutes § 4-176, petitioned the department for a declaratory ruling on whether the act was applicable to the termination of the CDI distributorship and, if so, whether the act was unconstitutional on several specified grounds. The department ruled that the act was applicable, that the termination notice was mailed after the act took effect, and declined to rule on the constitutional questions. Foremost took an administrative appeal to the Superior Court from the department's decision. This appeal was dismissed by the court on the ground that it could not disturb the department's factual finding. No further action has been taken on the administrative matter.

Foremost also brought a declaratory judgment action pursuant to General Statutes §§ 4-175 and 52-29, seeking a judicial determination of the constitutionality of the act. As in Schieffelin, the trial court held that the act did not apply retroactively to the Foremost-CDI relationship and did not reach the constitutional issues, from which judgment the department, CDI, Brescome and Heublein appealed[3] to this court.

---

[3] Curiously Eder, which was not a party by intervention or otherwise, joined in Brescome's appeal. We have ignored this obvious scrivener's error.

I

## APPLICABILITY OF PUBLIC ACTS 1981, No. 81-367

Public Acts 1981, No. 81-367[4], effective May 29, 1981, provided that the holder of a wholesale permit who had a distributorship for the sale of various alcoholic beverages for six months could not have that distributorship terminated or diminished by the manufacturer or out-of-state shipper except for just and sufficient cause. All of the wholesalers involved in the present litigation had held their distributorships for the requisite period at the time of their purported terminations.

---

[4] Public Acts 1981, No. 81-367 provides in pertinent part the following: "Sec. 2. Subsection (a) of section 30-17 of the general statutes is repealed and the following is substituted in lieu thereof:

"(a) (1) A wholesaler permit shall allow the bottling of alcoholic liquor and the wholesale sale of alcoholic liquor to permittees in this state and without the state, as may be permitted by law, and the sale of alcoholic liquors to vessels engaged in coastwise or foreign commerce, and the sale of alcohol and alcoholic liquor for industrial purposes to nonpermittees, such sales to be made in accordance with the regulations prescribed by the department of liquor control, and the sale of alcohol and alcoholic liquor for medicinal purposes to hospitals and charitable institutions and to religious organizations for sacramental purposes and the receipt from out-of-state shippers of multiple packages of still wines and sparkling wines. The holder of a wholesaler permit may apply for and shall thereupon receive an out-of-state shipper's permit for direct importation from abroad of alcoholic liquors manufactured outside the United States and an out-of-state shipper's permit for direct importation from abroad of beer manufactured outside the United States.

"(2) When a holder of a wholesale permit has had the distributorship of any alcohol, beer, spirits or wine product of a manufacturer or out-of-state shipper OR THEIR SUCCESSORS OR ASSIGNS for [twenty-four] SIX months or more, such distributorship may be terminated or its geographic territory diminished upon (A) the execution of a written stipulation by the wholesaler and manufacturer or out-of-state shipper OR THEIR SUCCESSORS OR ASSIGNS agreeing to the change and the approval of such change by the department of liquor control; or (B) the sending of a written notice by registered mail, return receipt requested, by the manufacturer or out-of-state shipper OR THEIR SUCCESSORS OR ASSIGNS to the wholesaler, a copy of which notice has been sent simultaneously by registered mail, return receipt requested, to the department of liquor control. No such ter-

It cannot be doubted that the act, by its very language, was intended to apply to any termination of a liquor distributorship which occurred after the act became effective. Thus the only question of statutory construction is whether the act was intended to affect existing distributorships, as claimed by the several defendants, or whether, as contended by the plaintiffs, the act is limited in its application to those distributorships which came into being after the act became effective. Were we to show the great deference which courts

mination or diminishment shall become effective except for just and sufficient cause, provided such cause shall be set forth in such notice and the department of liquor control shall determine, after hearing, that just and sufficient cause exists. If an emergency occurs, caused by the wholesaler, prior to such hearing, which threatens the manufacturer's or out-of-state shipper's OR THEIR SUCCESSOR'S OR ASSIGN'S products or otherwise endangers the business of the manufacturer or out-of-state shipper OR THEIR SUCCESSORS OR ASSIGNS and said emergency is established to the satisfaction of the department of liquor control, the department may temporarily suspend such wholesaler permit or take whatever reasonable action the department deems advisable to provide for such emergency and the department may continue such temporary action until its decision after a full hearing. The department of liquor control shall render its decision with reasonable promptness following such hearing. Notwithstanding the aforesaid, a manufacturer or out-of-state shipper OR THEIR SUCCESSORS OR ASSIGNS may appoint one or more additional wholesalers as the distributor for an alcohol, beer, spirits or wine product within such territory provided with regard to alcohol, spirits or wine products such appointment shall not be effective until six months, and with regard to beer products one year, from the date such manufacturer or out-of-state shipper OR THEIR SUCCESSORS OR ASSIGNS shall set forth such intention in written notice to the existing wholesaler by registered mail, return receipt requested, with a copy of such notice simultaneously sent by registered mail, return receipt requested, to the department of liquor control. For the purposes of this section, just and sufficient cause means the existence of circumstances which, in the opinion of a reasonable person considering all of the equities of both the wholesaler and the manufacturer or out-of-state shipper OR THEIR SUCCESSORS OR ASSIGNS, warrants a termination or a diminishment of a distributorship as the case may be.

"(3) Nothing contained herein shall be construed to interfere with the authority of the department of liquor control to retain or adopt reasonable regulations concerning the termination or diminishing of a distributorship held by a wholesaler for less than [twenty-four] SIX months."

normally accord to the construction given the statute by the agency charged with its enforcement; *Anderson v. Ludgin,* 175 Conn. 545, 555,400 A.2d 712 (1978); in this case the department, our inquiry would end at this point with a conclusion in favor of the position advanced by the defendants. But since the department's construction is only of recent vintage it lacks the persuasiveness of a practical construction placed on legislation over many years; see *Wilson* v. *West Haven,* 142 Conn. 646, 657, 116 A.2d 420 (1955); and we will pursue an independent inquiry into the proper construction of the act.

It is important to note at the outset that the mere fact that a statute is retrospective does not in itself render it invalid. *Mazurkiewicz* v. *Dowholonek,* 111 Conn. 65, 68, 149 A.234 (1930); *Atwood* v. *Buckingham,* 78 Conn. 423, 427, 62 A. 616 (1905). Thus, General Statutes § 55-3, which provides that "[n]o provision of the general statutes, not previously contained in the statutes of the state, which imposes any new obligation on any person or corporation, shall be construed to have a retrospective effect," establishes a rule of presumed legislative intent; *Nagle* v. *Wood,* 178 Conn. 180, 186, 423 A.2d 875 (1979); rather than a rule of law. If a legislative enactment contains language which unequivocally and certainly embraces existing business relationships, there is nothing in § 55-3 which would prevent it from so operating. *Little* v. *Ives,* 158 Conn. 452, 457, 262 A.2d 174 (1969).

The language of the act clearly refers to distributorships in existence at the time of its passage. This results from the use of the phrase "has had," in subsection (a) (2) of the act, which is the present perfect tense of the word "have." Words and phrases are to be construed according to the commonly approved usage of the language. General Statutes § 1-1 (a); *Caldor, Inc.* v. *Heffernan,* 183 Conn. 566, 570, 440 A.2d 767 (1981).

The use of the present perfect tense of a verb indicates an action or condition that was begun in the past and is still going on or was just completed in the present. Thus, although the act applies prospectively to terminations of distributorships, the criteria upon which such terminations are to be considered might well arise either before or after its effective date. Cf. *Hartford* v. *Suffield,* 137 Conn. 341, 343, 77 A.2d 760 (1950).

An examination of the circumstances of the act's passage is an additional aid in determining legislative intent. During the legislative debates on the bill, Representative Robert Carragher remarked: "Quite frankly, the reason for the change to six months is because we have a situation in Connecticut right now where an out-of-state manufacturer has decided to drop his relationship with three Connecticut wholesalers and give the entire State of Connecticut business for his product to only one wholesaler. And under current law, he can do this within a twenty-four month period. This amendment would change that period to six months and would thereby save the business of these three wholesalers and hopefully prevent this out-of-state manufacturer from doing this without showing just and sufficient cause." 24 H. R. Proc., Pt. 25, 1981 Sess., pp. 8365–66. In the state senate, Senator William Sullivan not only explained the effect of the amendment but also made it a point to remark that the act was effective on passage. 24 S. Proc., Pt. 15, 1981 Sess., p. 5052. The law was signed by the governor at 3:30 p.m. on May 29, 1981, the day of its passage by the General Assembly. While these events could not control unequivocal language to the contrary, they are, under the circumstances of this case, strong indications of the legislative intent. *Sullivan* v. *Town Council,* 143 Conn. 280, 286, 121 A.2d 630 (1956).

Finally, we turn back in time to 1971 when the General Assembly first passed what are now subsections (a) (2) and (a) (3) of § 30-17. Prior to that time there was no statute regulating the termination of a distributorship of alcoholic beverages. The 1971 statute established a just and sufficient cause basis for such termination in cases of distributorships held for a period of twenty-four months. The 1981 statute; Public Acts 1981, No. 81-367; reduced the durational period to six months and added the provision concerning successors or assigns but left the earlier statute intact in all other respects. Thus, if the 1981 statute does not apply to existing distributorships, neither did the 1971 enactment. If, as we assume, the purpose of the 1971 statute was to regulate what the legislature perceived as abuses in the liquor industry, then it would have labored mightily to have produced so inconsequential a piece of legislation, one that would have had no effect on existing distributorships of whatever duration and would have permitted a few manufacturers or out-of-state shippers to dominate the state liquor industry. Unless the statutory language expressly requires it we cannot attribute to the legislature an intent to produce an unworkable statute. *Pecora* v. *Zoning Commission,* 145 Conn. 435, 440, 144 A.2d 48 (1958). For all of the foregoing reasons, we conclude that Public Acts 1981, No. 81-367 applies to distributorships in existence at the time it became effective.

## II

### CONSTITUTIONALITY OF PUBLIC ACTS 1981, No. 81-367

The plaintiffs argue that the act, if applicable, is unconstitutional because (1) it impairs the obligations of their contracts with their distributors in violation of article one, § 10 of the constitution of the United States and (2) it violates the due process and equal pro-

tection provisions of the fourteenth amendment to the United States constitution and article first, §§ 8 and 20 of the Connecticut constitution.[5] We disagree.

## A

### CONTRACT CLAUSE

In considering whether the act violates the contract clause of the United States constitution[6] we assume, arguendo, that a contractual relationship existed between both plaintiffs[7] and their respective wholesale distributors and that the act resulted in some impairment of the obligations of these contracts.

In determining whether the challenged statute violates the contract clause certain criteria are to be considered. The threshold question is whether the state law has in fact operated as a substantial impairment of a contractual relationship. *Energy Reserves Group, Inc.* v. *Kansas Power & Light Co.,* 459 U.S. 400, 103 S. Ct. 697, 74 L. Ed. 2d 569 (1983). Factors to be weighed are the severity of the impairment, the extent to which it frustrates a party's reasonable contractual

---

[5] Foremost makes the additional claim that as private legislation the statute exceeded the legislative power vested in the General Assembly by article third, § 1 of the Connecticut constitution. We have construed this provision as prescribing a limitation on legislative power only when the statute has no other purpose than an individual's gain or profit. *Tough* v. *Ives,* 162 Conn. 274, 292, 294 A.2d 67 (1972); see also Conn. Const., art. I § 1. As will become apparent from our discussion of the other constitutional issues, this provision has no application of the facts of this case.

[6] Article one, § 10 of the United States constitution provides in pertinent part: "No State shall . . . pass any . . . Law impairing the Obligations of Contracts . . . ."

[7] Schieffelin had a written distribution agreement with Brescome and Eder. Although the record is barren of any evidence of either a written or oral agreement between Foremost and CDI, since it is undisputed that CDI held a distributorship by appointment from Foremost, we may safely assume the contractual nature of this relationship. See *Trustees of Bishop's Fund* v. *Rider,* 13 Conn. 87, 94 (1839); but see *Robert Porter & Sons, Inc.* v. *National Distillers Products Co.,* 324 F.2d 202, 205 (10th Cir. 1963).

expectations and the extent to which the subject matter of the impairment has been regulated in the past. Id. If the impairment is minimal the inquiry may end at the embryonic stage. *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 245, 98 S. Ct. 2716, 57 L. Ed. 2d 727, reh. denied, 439 U.S. 886, 99 S. Ct. 233, 58 L. Ed. 2d 201 (1978). If, however, the impairment is severe, the legislation will be subjected to an increased level of scrutiny. Id. On the other hand, no matter how severe the impairment, a state regulation which does no more than restrict a party to gains it reasonably expected from the contract does not necessarily constitute a substantial impairment within the meaning of the contract clause. *United States Trust Co. v. New Jersey,* 431 U.S. 1, 31, 97 S. Ct. 1505, 52 L. Ed. 2d 92 (1977). Moreover, if one buys into an enterprise already regulated in the particular to which he now objects, he buys subject to further legislation upon the same topic. *Allied Structural Steel Co. v. Spannaus,* supra, 242; *Veix v. Sixth Ward Building & Loan Assn.,* 310 U.S. 32, 38, 60 S. Ct. 792, 84 L. Ed. 1061 (1940).

In these cases the several distributorships were created in September, 1980. It is clear that absent Public Acts 1981, No. 81-367, these distributorships could have been terminated without cause.[8] We may

---

[8] Section 30-6-B7 of the department's regulations required, in the case of termination of distributorships in existence for less than twenty-four months, a ninety day written notice and approval by the department. Regs., Conn. State Agencies § 30-6-B7. The department, citing *State ex rel. American Distilling Co. v. Patterson,* 133 Conn. 345, 349, 51 A.2d 141 (1947), argues that it has discretion in approving termination of short duration distributorships, that the public policy in favor of "just cause" terminations embodied in General Statutes § 30-17 carried over into the regulation; see *Shell Oil Co. v. Marinello,* 63 N.J. 402, 307 A.2d 598 (1973), cert. denied, 415 U.S. 920, 94 S. Ct. 1421, 39 L. Ed. 2d 475 (1974); and, therefore, it could consider "just cause" in making its determination whether to grant or deny approval of a given termination. We need not consider whether subsection (c) of § 30-17 authorizes the department to adopt a "just cause" regulation. The regulation itself contains no such requirement. In the absence of appropriate standards set out in the statute or appropriate administrative safeguards provided in the regulations, neither of which is

assume,[9] without deciding, that the act severely impaired the plaintiffs' right to terminate their distributorships. "[T]he right of unilateral termination upon [ninety] days notice for which [the plaintiffs] bargained must be accounted a critical feature of its total contractual relationships with [their distributors]. It insured that an unprofitable relationship or one simply plagued with nagging personal or administrative problems that made its overall value questionable could be cut off without expense or delay arising from need to justify it either out of court or in court. In view of the obvious value of this contractual right, [the plaintiffs'] reliance upon it as a critical aspect of [their distributorships] is manifest. The challenged legislation severely modified this contractual right. . . . [I]ts effect is to make every termination subject to costly and disruptive legal challenges with no guarantee that even 'rightful' terminations would be so adjudged in the always chancey litigation process." *Garris* v. *Hanover Ins. Co.*, 630 F.2d 1001, 1006 (4th Cir. 1980).

present here, the department walks on very thin ice in pressing its argument based on departmental regulations. 1 Davis, Administrative Law Treatise § 3:15, pp. 206–16.

[9] A number of cases which have dealt with the constitutional impact of "just cause" legislation are factually dissimilar from the present case. In *Garris* v. *Hanover Ins. Co.*, 630 F.2d 1001 (4th Cir. 1980), for example, the legislation in effect required each insurer to establish uniform rate schedules and to insure any and all applicants at these set rates. They could only reinsure up to 35 percent of the statutorily required accepted risks. Thus the financial impact of losing a suit for wrongful cancellation could be extensive. Similarly, in *Globe Liquor Co.* v. *Four Roses Distillers Co.*, 281 A.2d 19 (Del.), cert. denied, 404 U.S. 873, 92 S. Ct. 103, 30 L. Ed. 2d 117 (1971), the statutorily prescribed damages for a wrongful termination included, inter alia, loss of profits presumed to be not less than five times the profit in the most recently completed year. And in *Fornaris* v. *Ridge Tool Co.*, 423 F.2d 563 (1st Cir.), rev'd on other grounds, 400 U.S. 41, 91 S. Ct. 156, 27 L. Ed. 2d 174 (1970), involving Puerto Rico's Dealers Contract Law, a termination of a dealer's contract for reasons other than "just cause" as defined in the statute made the manufacturer liable to substantial damages. Although imposing a just cause ground for terminating a contractual relationship does change the basis of the relationship and to that extent enhances the rights of one party at the expense of the other, to characterize such change as severe is, at the very least, open to question.

On the assumption that the imposition of a "just cause" requirement for termination of a contractual relationship theretofore terminable at will requires that the state regulation be further scrutinized, we next consider the reasonable expectation and regulatory aspects of the problem.

It is to state the obvious to observe that the liquor industry is heavily regulated. Both before and after Prohibition the social problems generated by the consumption of alcoholic beverages have occasioned the enactment of remedial legislation. "The object of the legislature in passing . . . [a law respecting the sale of ardent spirits], was to aid the suppression of intemperance, pauperism and crime; evils which impose very heavy and onerous burdens upon the public. The expenses attending the prosecution of crimes, the support of criminals, and the maintenance of paupers are very great; and no one can doubt but that, to a very great extent they have been caused by the multitude of tippling shops with which our community has been heretofore infested." *State* v. *Brennan's Liquors,* 25 Conn. 278, 288 (1856). In *Connecticut Breweries Co.* v. *Murphy,* 81 Conn. 145, 151, 70 A. 450 (1908), we upheld specific licensing provisions against the claim that they were harsh and arbitrary. "The provisions of the Act are arbitrary, in instances harsh and liable to operate inequitably and unjustly. Such liability seems to be a necessary incident to legislation of this character." Id.

Since the adoption of the twenty-first amendment to the constitution of the United States, which allows the states to regulate the liquor industry, this industry has been subject to extensive legislative regulation and this regulation has extended to manufacturers and out-of-state shippers. A manufacturer or out-of-state shipper is required to obtain a permit; General Statutes §§ 30-16, 30-18, 30-19; to register its products' brand

names and its authorized wholesale distributors; General Statutes § 30-63; to list the prices at which it will sell its products to the Connecticut wholesalers in the succeeding month; General Statutes § 30-63 (c); and to certify that the product is not being sold at a lower price in any other state. General Statutes § 30-63a. In addition, there are provisions precluding rebates, free goods and tie-in sales. General Statutes § 30-94. "These and other provisions of Connecticut statutes relating to credit, advertising, etc., make it apparent that Connecticut intends to and does control the supplying out-of-state shipper . . . to make certain that the owner of the brand name, out-of-state shipper, cannot dominate or control the Connecticut wholesalers. To promote this latter purpose, Connecticut has imposed statutory restrictions on the shipper's ability to terminate the authority of a wholesaler to distribute its products." Brennan, "Liquor Control," 54 Conn. B.J. 611, 613–14.

Here, the plaintiffs were well aware that they were engaged in a highly regulated business. Nor could they have been unaware of the social and economic problems created by sudden termination of franchises. During the early 1970s, for example, just cause termination provisions were included in a variety of franchising statutes in Connecticut. See generally Farrell, "Franchising in Connecticut–'Can Anybody Here Play This Game?' ", 54 Conn. B.J. 446. "Just cause" terminations were also part of the statutory framework of General Statutes § 30-17 at the time of its enactment as Public Acts 1971, No. 605. The fact that this requirement was then applicable to twenty-four month distributorships is of no consequence. Having entered the heavily regulated field of liquor distributorships in which certain restrictions were already imposed on the termination of those distributorships, those subject to general regulation could reasonably anticipate that in the course of time the durational requirement might change. It was therefore

reasonably foreseeable that the twenty-four month distributorship as a requirement for just cause termination would not remain static and, in all likelihood, would be reduced.

In the face of the pervasive regulatory power which the state has exercised over the liquor industry, the reasonable expectations of the plaintiffs at the time they entered their business relationships with CDI, Brescome and Eder, and the scope of the regulatory provisions in existence at the time these relationships were created, reducing the holding period for just cause terminations from twenty-four to six months can hardly be regarded as either cataclysmic or as a substantial impairment of the plaintiffs' distributorship relationships.

Even a substantial impairment of a contractual relationship may be justified if the state regulation has a significant and legitimate purpose. *Energy Reserves Group, Inc.* v. *Kansas Power & Light Co.*, supra, 403; *United Trust Co.* v. *New Jersey,* supra, 22. In considering this aspect of the constitutional problem we cannot ignore the peculiar nature of the industry being regulated. "Because of the danger to the public health and welfare inherent in the liquor traffic, the police power to regulate and control it runs broad and deep, much more so than the power to curb and direct ordinary business activity." *Ruppert* v. *Liquor Control Commission,* 138 Conn. 669, 674, 88 A.2d 388 (1952).

Section 2 of the twenty-first amendment reserves to the states certain powers to regulate traffic in liquor. "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." This amendment has been recognized as conferring something more than the normal state authority over public health, welfare

and morals. *California* v. *LaRue,* 409 U.S. 109, 114, 93 S. Ct. 390, 34 L. Ed. 2d 342 (1972), reh. denied, 410 U.S. 948, 93 S. Ct. 1351, 35 L. Ed. 2d 615 (1973). Nor is the regulatory power embodied in this amendment limited to importing and transporting alcohol. Rather, it grants the states virtually complete control over whether to permit importation and sale of liquor and how to structure the liquor distribution system. *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.,* 445 U.S. 97, 110, 100 S. Ct. 937, 63 L. Ed. 2d 233 (1980).

A statutory method, such as that employed in § 30-17, which prescribes the conditions under which distributorships may be terminated is a legitimate method of structuring the state's liquor distribution system. Additionally, it serves the equally important purpose of preventing out-of-state shippers from dominating Connecticut wholesalers. See *Joseph E. Seagram & Sons, Inc.* v. *Hostetter,* 384 U.S. 35, 48, 86 S. Ct. 1254, 16 L. Ed. 2d 336, reh. denied, 384 U.S. 967, 86 S. Ct. 1583, 16 L. Ed. 2d 679 (1966).

Economic dominion of one tier of distribution upon another lends itself to all sorts of abusive practices. In this respect the case of *Adolph Coors Co.* v. *F.T.C.,* 497 F.2d 1178 (10th Cir. 1974), is enlightening. The Coors distributor contract contained a provision authorizing cancellation of the agreement without cause upon thirty days written notice. Despite Coors' claim that its contract termination rights were reasonable and legal and that its conduct in the rare instances of its use had been proper and legal in every respect, the federal trade commission held that "[w]hether or not any actual terminations of Coors distributors, or sales forced by threat of termination can be ascribed entirely, solely and unambiguously to the failure of the terminated or coerced distributor to participate in an antitrust violation, it is abundantly clear from the record in this case

that Coors representatives have used the explicit or implicit threat [of] speedy termination [in] often successful . . . efforts to force the acquiescence of its distributors in anticompetitive behavior." Id., 1188. Given the mischief which is the target of the legislation it is of little consequence whether the feared abuses are presently demonstrable. If certain practices tend to create societal abuses, "it is immaterial that the tendency is a creeping one rather than one that proceeds at full gallop; nor does the law await arrival at the goal before condemning the direction of the movement." *International Salt Co.* v. *United States,* 332 U.S. 392, 396, 68 S. Ct. 12, 92 L. Ed. 20 (1947). In sum, there can be little doubt about the legitimacy of the purpose of the act.

The final factor in the contracts clause equation is whether the means chosen to implement the stated or perceived public purpose is constitutionally deficient. The focus here is on whether the aim of the regulation is properly targeted. *Allied Structural Steel Co.* v. *Spannaus,* supra, 250. When considering this aspect of the constitutional problem, especially in the economic and social fields, courts properly defer in large measure to the legislative judgment as to the necessity and reasonableness of a particular measure. *Energy Reserves Group, Inc.* v. *Kansas Power & Light Co.,* supra, 405; *United Trust Co.* v. *New Jersey,* supra, 22–23.

The plaintiffs claim that the act was limited in scope, designed to protect only three distributors. We disagree. The fact that three distributors, CDI, Brescome and Eder, are the immediate beneficiaries of the regulation is incidental. *Katz* v. *Brandon,* 156 Conn. 521, 533, 245 A.2d 579 (1968); *Lyman* v. *Adorno,* 133 Conn. 511, 516, 52 A.2d 702 (1947). When the twenty-four month provision was enacted in 1971, its broad aim to control and stabilize the distribution of alcoholic bever-

ages in the state would not have been circumscribed had it appeared that at that time only a few distributors qualified for its protection. The same reasoning applies to the six-month distributorships protected by Public Acts 1981, No. 81-367. The appropriateness of legislation is determined not by the impulse of the messenger but rather by the thrust of the message. In sum, for all of the foregoing reasons we conclude that the contracts clause is not an insurmountable constitutional hurdle for Public Acts 1981, No. 81-367.

## B

### DUE PROCESS AND EQUAL PROTECTION

The plaintiffs claim that the act violated due process in that it was enacted in violation of the procedural rules of the state senate and it bears no rational relationship to the objective sought to be obtained.

The claim respecting violation of legislative procedural rules need not detain us. Article third, § 13 of the Connecticut constitution provides that "[e]ach house shall determine the rules of its own proceedings . . . and shall have all other powers necessary for a branch of the legislature of a free and independent state." "Rules of proceedings are the servants of the House and subject to its authority. This authority may be abused, but when the House has acted in a matter clearly within its power, it would be an unwarranted invasion of the independence of the legislative department for the court to set aside such action as void, because it may think that the House has misconstrued or departed from its own rules of procedure." *State* v. *Savings Bank of New London,* 79 Conn. 141, 152, 64 A. 5 (1906). In the final analysis, if legislation is passed without prior notice to the public, without a public hearing and in violation of the joint rules of the General Assembly, the only remedial process that is available to those aggrieved by such action is political rather than judicial.

The plaintiffs' substantive due process claim is also without merit. Legislative efforts to structure and accommodate the burdens and benefits of economic life carry a presumption of constitutionality. One complaining of a due process violation flowing therefrom must establish that the legislature has acted in an arbitrary and irrational way. *Duke Power Co.* v. *Carolina Environmental Study Group,* 438 U.S. 59, 84, 98 S. Ct. 2620, 57 L. Ed. 2d 595 (1978). "While constitutional guarantees are not suspended merely because of the twenty-first amendment to the constitution of the United States . . . that amendment does give the state 'virtually complete control over . . . how to structure the liquor distribution system.' [*California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.,* 445 U.S. 97, 110, 100 S. Ct. 937, 63 L. Ed. 2d 233 (1980)]." *Brunswick Corporation* v. *Liquor Control Commission,* 184 Conn. 75, 84, 440 A.2d 792 (1981). Our statement with respect to the contracts clause challenge applies with equal force to the due process claim. The legislature has acted within its competence in regulating the conditions under which distributorships may be terminated.

Finally, we address the equal protection claim. We judge this claim by the rational basis test. *Brunswick Corporation* v. *Liquor Control Commission,* supra, 83. Although the fact that the product being regulated is liquor does not qualify individual rights protected by the bill of rights or the fourteenth amendment; *Craig* v. *Boren,* 429 U.S. 190, 206, 97 S. Ct. 451, 50 L. Ed. 2d 397 (1976), reh. denied, 429 U.S. 1124, 97 S. Ct. 1161, 51 L. Ed. 2d 574 (1977); where the regulation, as in this case, touches upon purely economic matters it is subject to the mildest review under the fourteenth amendment. Id., 207; *Joseph E. Seagram & Sons, Inc.* v. *Hostetter,* supra, 47–48, 50–51. There is nothing magic about twenty-four months or for that matter six

months. The appropriate qualifying period was a matter of legislative judgment. "A statute is not invalid under the Constitution because it might have gone farther than it did, or because it may not succeed in bringing about the result that it tends to produce." *Roschen* v. *Ward,* 279 U.S. 337, 339, 49 S. Ct. 336, 73 L. Ed. 722 (1929).

There is error in both cases. The judgment in the Foremost case is set aside and the case is remanded with direction to render judgment in accordance with this opinion. In the Schieffelin case, because the trial court decided that the act was not applicable, it did not reach other issues raised in the administrative appeal. The judgment in the Schieffelin case is set aside and the case is remanded for further proceedings consistent with this opinion.

In this opinion the other judges concurred.