OPINION OF THE COURT
Thomas F. Whelan, J.
This case examines the law governing the rights of the parties concerning the termination of Garal’s beer distributorship. The court is called upon to determine whether certain recent amendments to the controlling statute, Alcoholic Beverage Control Law § 55-c, are unconstitutional as violative of the constitutional prohibition against impairing the obligations of contracts (see US Const, art I, § 10 [1]). Garal believes that the amendments advance the beneficial purpose of the statutory scheme for the regulation of the sale and marketing of beer within the state and that Miller is seeking to accomplish the very thing that the legislation was specifically designed to prevent. Miller believes that by applying the amendments retroactively, the State Legislature had “changted] the rules in the middle of the game” and substantially impaired “the rights that Miller reserved for itself in its distributor agreement with Garal and the rights that Miller had under New York law at the time that it sent its [termination] notice.” Since the court finds that the distributor agreement anticipated future changes in state law requirements concerning “differing termination notice periods, procedures, or justifications,” the Contract Clause claim must be dismissed.
This is an action by Garal, a licensed beer wholesaler, against Miller, a brewer, seeking to stop Miller from terminating Garal’s beer distributorship rights. Garal seeks declaratory and injunctive relief under Alcoholic Beverage Control Law § 55-c. In its answer, Miller has raised, as its first affirmative defense, that “Garal’s claims under ABCL § 55-c should be dismissed because they are based upon amendments that cannot, under the Contract Clause, be retroactively applied to the relationship between Miller and Garal.” The parties have stipulated to an early determination of this issue by the court.
Garal is licensed by the New York State Liquor Authority to sell beer at wholesale pursuant to Alcoholic Beverage Control Law § 53. Garal purchases beer from different brewers which it resells to license beer retailers. In 1998, Garal purchased the distributorship rights for various brands of beer manufactured by the Pabst Brewing Company (Pabst). At that time, Garal *632 entered into an exclusive distributorship agreement with Pabst. Garal’s exclusive territory for the acquired Pabst brands is Nassau and Suffolk Counties. In 1999, Miller acquired from Pabst some of the brands previously sold by Pabst, including some of the brands sold by Garal under the Pabst distributorship agreement. By virtue of an April 21, 1999 letter, Miller acknowledged to Garal that their relationship “will be governed by the terms of the current agreement for these acquired brands and New York law.”
By letter dated August 31, 2001, Miller notified Garal that it intended to transfer Garal’s distributorship rights in the acquired Pabst brands to another distributor. The letter stated that Miller had “instituted a national consolidation policy” and that pursuant to that policy, it had determined to have the acquired Pabst brands distributed by the existing distributor that currently sells the Miller brand. The letter also terminated the distributor agreement as of November 30, 2001.[1] It is Garal’s position that any attempt to terminate the distributorship agreement must comply with the provisions of Alcoholic Beverage Control Law § 55-c. Alcoholic Beverage Control Law § 55-c, enacted in 1996, and amended in 1997 and 2001, governs the rights of brewers and wholesalers in regard to distribution agreements within the State of New York.[2] Both the distributor agreement and Alcoholic Beverage Control Law § 55-c specify that Alcoholic Beverage Control Law § 55-c supercedes any conflicting provisions of the written agreement, particularly with regard to terminations. The distributor agreement states in pertinent part, at paragraph 15 (B): “To the extent applicable, if state or local laws require longer or otherwise differing termination notice periods, procedures, or justifications, then this Agreement is amended to incorporate such requirements.”
Alcoholic Beverage Control Law § 55-c (3) states, in pertinent part: “Written agreement required. * * * [B]eer offered for sale in this state by a brewer to a beer wholesaler shall be sold and delivered pursuant to a written agreement which conforms to the provisions of this section * * * .”
*633 Alcoholic Beverage Control Law § 55-c (4) (a), which precludes terminations except in accordance with the statute, states, in pertinent part:
“No brewer may cancel, fail to renew, or terminate an agreement unless the party intending such action has good cause for such cancellation, failure to renew, or termination and in any case in which prior notification is required under this section, the party intending to act has furnished said prior notification as provided for in subdivision five of this section * * * .”
Alcoholic Beverage Control Law § 55-c (11), which precludes superceding the law by written agreement, states: “The requirements of this section may not be altered, waived or modified by written or oral agreement in advance of a bona fide case and controversy arising under a written agreement complying with this section.”
As originally enacted, in 1996, Alcoholic Beverage Control Law § 55-c did not specify any objective standards as to what constitutes the “national or regional policy of consolidation” and did not require the brewer to pay damages to the terminated wholesaler prior to termination. It has been claimed that such resulted in questionable consolidation plans supporting distributor termination contrary to the intention of the law (see Governor’s Bill Jacket, L 2001, ch 346, at 8, 11, 14, 32).[3] Moreover, on January 12, 2001, the law, as originally drafted, led to a dismissal of a distributor’s preliminary injunction action seeking to enjoin a brewer from terminating a distributor before the validity of an alleged consolidation policy was shown, since such was not authorized under the law (see Oak Beverages, Inc. v Heineken USA, Inc., Sup Ct, Orange County, Index No. 7757/00, Owen, J.).
On June 15, 2001, the New York State Legislature passed amendments to Alcoholic Beverage Control Law § 55-c, that is chapter 346 of the Laws of 2001. The legislation was not signed into law by Governor George E. Pataki until September 19, *634 2001; however, the amendments to the law were expressly made effective and retroactive to June 15, 2001. In fact, the actual language states: “[t]his act shall take effect immediately and shall be deemed to have been in full force and effect on and after June 15, 2001, and shall apply to agreements amended, cancelled, terminated, modified or not renewed on or after such date” (L 2001, ch 346, § 7).
The Senate sponsor, Owen H. Johnson, in his State Senate Introducer’s Memorandum, offered the following rational for the amendments:
“Unfortunately, a recent court decision has brought about a result unintended by the legislature in its adoption of section 55-c by rejecting a wholesaler’s request for preliminary injunctive relief without first requiring the supplier to meet the statutory burden of proof as to whether its putative consolidation policy qualified under the criteria established by the legislature, (see Oak Beverages. Inc. et. at [sic] v Heineken USA Inc. Supreme Court, Orange County, January 12, 2001).”
The memorandum also noted that “in order to qualify as good cause for the termination of a relationship under the statute, [the consolidation plan] must truly be multi-state in its implementation and contemporaneously pursued by a brewer as a matter of business necessity.”
As noted above, Miller’s termination letter of August 31, 2001 was after passage of the legislation by the State Senate and State Assembly, after the legislation’s effective date, but before the Governor’s signature. The retroactive nature of the legislation was commented upon in a September 5, 2001 letter, set forth in the legislative Bill Jacket (see Governor’s Bill Jacket, L 2001, ch 346, at 8), from the Senate sponsor, Owen H. Johnson, to Governor Pataki (“This was done to preempt attempts by brewers to impose unilateral consolidations under their interpretations of the law during the period between its passage by the legislature and your anticipated signing”). Additionally, Assembly Majority Leader, Paul A. Tokasz, in a September 7, 2001 letter to the Governor’s counsel, James McGuire, addressed the retroactivity of the legislation and the Legislature’s desire to avoid “gap terminations” (“It is the Legislature’s intent that any termination pursuant to an alleged plan of national or regional consolidation for which notices have been given pursuant to Section 55-c(e)(i) subsequent to June 15, 2001 shall be unlawful and enjoinable unless the *635 same is determined to be in compliance with the amended law”) (see Governor’s Bill Jacket, L 2001, ch 346, at 4).
As now amended, Alcoholic Beverage Control Law § 55-c prohibits termination of a beer wholesaler’s distributorship agreement except under very circumscribed occurrences (see Alcoholic Beverage Control Law § 55-c [2] [e] [i]). Under the statute, where a brewer relies upon a consolidation policy for termination, the brewer must prove that the consolidation policy complies with the requirements of the law (see Alcoholic Beverage Control Law § 55-c [6]) and the brewer must pay the wholesaler reasonable compensation for the loss of the distributorship rights prior to termination as a condition of termination (see Alcoholic Beverage Control Law § 55-c [7] [a]). Alcoholic Beverage Control Law § 55-c permits termination only for “good cause,” as defined at Alcoholic Beverage Control Law § 55-c (2) (e). Only two causes for termination are recognized. The one that is applicable is if a brewer is implementing a national or regional policy of consolidation of its distributorship network “which is reasonable, nondiscriminatory and essential. Such policy shall have been previously disclosed, in writing, in reasonable detail to the brewer’s wholesalers, and shall result in a contemporaneous reduction in the number of a brewer’s wholesalers not only for a brand in this state, but also for a brand in contiguous states or in a majority of the states in which the brewer sells the brand” (Alcoholic Beverage Control Law § 55-c [2] [e] [i] [A]).
A new provision adds that a brewer may not terminate a distributorship agreement unless the brewer provides the wholesaler with prior notification in writing by certified mail which contains, among other things, a statement of all the reasons for the termination stated “in reasonable detail” (Alcoholic Beverage Control Law § 55-c [5] [a], [c]). As noted, the amendments mandate that a brewer must pay the wholesaler compensation for the loss of the distributorship rights prior to termination. Compensation is defined as “the fair market value of the distribution rights [as defined in Alcoholic Beverage Control Law § 55-c (2) (i)] which will be lost or diminished by reason of the implementation of such policy, together with fair and reasonable compensation for other damages sustained” (Alcoholic Beverage Control Law § 55-c [7] [a]). Finally, the amendments made clear that legal remedies are not exclusively set forth in the law and that traditional commercial tort and common-law remedies are retained as well.
It is Garal’s argument that the express intent of the amendments was to halt terminations of a wholesaler’s distributor *636 ship under the guise of some undefined “consolidation policy.” As shown above, the 2001 amendments require, among other things, the consolidation policy to be in writing, in reasonable detail, and the result of a reduction of wholesalers “not only for a brand in this state, but also for a brand in contiguous states or in a majority of the states in which the brewer sells the brand.” Garal correctly states that Miller’s August 31, 2001 termination letter fails to satisfy the new amendments to Alcoholic Beverage Control Law § 55-c, as to the requisite notice, as to the national consolidation policy, and as to the compensation required.
Miller claims that the amendments had the effect of retroactively impairing its contractual rights in violation of the constitutional prohibition against impairing the obligations of contracts (see US Const, art I, § 10). It also claims that when Miller assumed the distributorship agreement in 1999, Alcoholic Beverage Control Law § 55-c gave brewers broad discretion to consolidate their brand rights to reduce the number of distributors in New York. Miller claims that when it gave Garal notice of termination on August 31, 2001, it complied with the then-governing version of Alcoholic Beverage Control Law § 55-c. Miller further claims that the amendments added at least five new elements to Alcoholic Beverage Control Law § 55-c that were not present when Miller (through its predecessor) and Garal entered into their distributor agreement in 1998.
Notice of a challenge to the constitutionality of a state statute was provided to the Attorney General of the State of New York pursuant to Executive Law § 71 and CPLR 1012 (b). By letter dated April 29, 2002, a determination was made by the Attorney General’s office not to participate, at this time.
Analysis begins with the axiom that enactments of the Legislature are presumed to be constitutional and the party asserting the unconstitutionality bears the heavy burden of demonstrating the unconstitutionality beyond a reasonable doubt (see Matter of Saratoga Water Auth. Servs. v Saratoga Water Auth., 83 NY2d 205, 211 [1994]). As noted in Matter of McGee v Korman (70 NY2d 225, 231 [1987]), “[e]nactments of the Legislature — a coequal branch of government — may not casually be set aside by the judiciary.” Moreover, as recognized by the United States Supreme Court, in Brown-Forman Distillers Corp. v New York State Liq. Auth. (476 US 573, 585 [1986]), “New York has a valid constitutional interest in regulating sales of liquor within the territory of New York.” Of course, *637 “the [21st] Amendment does not license the States to ignore their obligations under other provisions of the Constitution” (Capital Cities Cable, Inc. v Crisp, 467 US 691, 712 [1984]; see Brown-Forman Distillers Corp., 476 US at 584-585 [Commerce Clause challenge]). Here, the claim is that retroactive application of the amendments to the preexisting contract between Miller and Garal violates the Contract Clause of the United States Constitution, which states, in pertinent part, “[n]o State shall * * * pass any * * * Law impairing the Obligation of Contracts * * * ” (US Const, art I, § 10 [a]). The challenge is not a prospective one.
The court cannot agree with Miller’s contention that “Miller and Garal did not contract for any of the new restrictions contained in the Amendments to Section 55-c.”
As a matter of public policy, alcohol manufacture, sale, and distribution, including the termination of a beer distributorship, is an area that is comprehensively and pervasively regulated. The declared policy of New York is that it is necessary to regulate and control the manufacture, sale, and distribution of alcoholic beverages (see Alcoholic Beverage Control Law §§ 2, 101-b). Here, the challenged provisions implement that legislative determination. All parties acknowledge that the liquor industry is heavily regulated. Alcoholic Beverage Control Law § 55-c appears to be modeled after the Wisconsin Fair Dealership Law (Wis Stat Ann § 135.01 et seq.), “a remedial statute, intended to protect dealers whom the legislature recognizes as having an inferior bargaining position in negotiating dealership agreements with grantors (franchisors)” (Ziegler Co., Inc. v Rexnord, Inc., 147 Wis 2d 308, 323, 433 NW2d 8, 14 [1988]).
Subdivision (10) (a) of section 55-c, as originally adopted, provided that the law “shall not apply to written agreements that were in effect prior to the effective date of this section.” The effective date was September 25, 1996. The subdivision further stated: “[pjrovided, however, that this section shall apply to any agreement entered into, renewals, extensions, amendments or conduct constituting a material modification of an agreement on or after the effective date of this section.” Therefore, section 55-c applies to this agreement, which was entered into in 1998.
Moreover, as set forth above, paragraph 15 (B) of the distributor agreement states: “if state or local laws require longer or otherwise differing termination notice periods, procedures, or justifications, then this Agreement is amended to incorporate such requirements.”
*638 It is an elementary principle of contract interpretation that, when parties to an agreement intend that their written agreement constitutes the entire understanding between the parties, the courts should enforce their agreement as written (see e.g., Western Union Tel. Co. v American Communications Assn., 299 NY 177 [1949]). This rule adds certainty to contract interpretation and enforcement (see R/S Assoc. v New York Job Dev. Auth., 98 NY2d 29 [2002]). In W.W.W. Assoc. v Giancontieri (77 NY2d 157 [1990]), the Court of Appeals had occasion to revisit and reaffirm this fundamental principle of contract law “when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms” (77 NY2d at 162, supra). When the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving practical interpretation to the language employed and the parties reasonable expectations (see Slamow v Del Col, 174 AD2d 725, 726 [2d Dept 1991], affd 79 NY2d 1016 [1992]; W.W.W. Assoc., 77 NY2d 157, supra). Thus, “clear, complete writings should generally be enforced according to their terms” (W.W.W. Assoc. at 160). Interpretation of an unambiguous contract is a matter for the court (see Sunrise Mall Assoc. v Import Alley of Sunrise Mall, 211 AD2d 711 [2d Dept 1995]; Lake Constr. & Dev. Corp. v City of New York, 211 AD2d 514 [1st Dept 1995]).
Here, the court is called upon to interpret the clear and unambiguous language of paragraph 15 (B) of the distributor agreement in light of the statutes that are incorporated into the agreement by virtue of that mutually agreed upon provision. Generally, statutes are construed as prospective in effect unless there is a clear legislative intent to make them operate retrospectively (see McKinney’s Cons Laws of NY, Book 1, Statutes § 51 [b]; § 52; Western N.Y. & Pa. Ry. Co. v City of Buffalo, 296 NY 93, 98 [1947]). There is no doubt that the Legislature expressed its intention that the amendments should apply to contracts previously made (cf. Gimbel Bros. v Brook Shopping Ctrs., 118 AD2d 532 [2d Dept 1986]). The amendments contain a clear statement concerning retroactivity.
Additionally, a court may not construe an agreement so that it is modified by a subsequent statutory enactment which changes the rights and obligations of the parties, absent a clear expression in the contract that such is the parties’ intention (see Pioneer Transp. Corp. v Kaladjian, 105 AD2d 698 *639 [2d Dept 1984]). The court holds that such an intention is evinced by paragraph 15 (B) of the agreement in this case.
Moreover, “remedial” legislation or statutes governing procedural matters should be applied retroactively (see Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577 [1998]), particularly to avoid undermining its remedial purpose (see Matter of OnBank & Trust Co., 90 NY2d 725 [1997]; see also Matter of Gleason [Vee], 96 NY2d 117, 122 [2001] [“Other factors in the retroactivity analysis include whether the Legislature has made a specific pronouncement about retroactive effect or conveyed a sense of urgency; whether the statute was designed to rewrite an unintended judicial interpretation; and whether the enactment itself reaffirms a legislative judgment about what the law in question should be”]).
In reviewing the case law concerning statutory construction, the court is drawn to Jacobus v Colgate (217 NY 235 [1916]), wherein Judge Cardozo wrote (at 240) that “[t]he general rule is that statutes are to be construed as prospectively only. It takes a clear expression of the legislative purpose to justify a retroactive application. Changes of procedure, i.e., of the form of remedies, are said to constitute an exception, but that exception does not reach a case where before the statute there was no remedy whatever. To supply a remedy where previously there was none of any kind, is to create a right of action.” (Citations omitted.)
In Jacobus (id. at 244), Judge Cardozo found “[t]he decisive consideration here is that until the statute was adopted, no remedy of any kind was available in any court.” In the instant case, the amendments did not create a right which did not exist before, but merely created, or expanded upon, a remedy for an antecedent right (cf. Matter of Deutsch v Catherwood, 31 NY2d 487 [1973]). The court concurs with the argument advanced by Garal that “[t]he Amendments did not add substantial new burdens on a brewer seeking to terminate for consolidation. The Amendments were largely clarifications of the existing law enacted to counter misinterpretations of the law” (see letter submission, dated June 19, 2002, Barry A. Wadler, Esq.).
Here, many aspects of the amendments are remedial in nature. As recognized by the Court of Appeals in Matter of Duell v Condon (84 NY2d 773, 783 [1995]), a case where the Legislature did not expressly state that the statute was to be applied retroactively, “statutes that are remedial in nature may be applied retrospectively.” (Citation omitted.) Notwith *640 standing Miller’s claim (see letter submission, June 19, 2002, Thomas E. Healy, Esq.) that attempts, in out of state cases, to “level the playing field” or of “equalization of bargaining power,” does not serve a broad public purpose, the Court in Matter of Duell (84 NY2d at 783) applied the statute retroactively to leases executed prior to the effective date of the statute since “[t]he remedial nature of the Legislature’s action to equalize the power of landlords and tenants is evident from both the language of the statute as well as historical documents (see, Bill Jacket, L 1966, ch 286).” Additionally, as held in Goldfarb v Goldfarb (86 AD2d 459, 461 [2d Dept 1982]), “a contract ‘may be affected by subsequent legislation in the exercise of the police power, or by a subsequent statute announcing a new public policy * * * or by repeal of a prohibitory act’.” (Citations omitted.) Here, upon review of the legislative Bill Jacket, it certainly can be argued that the amendments represent a change in the public policy concerning termination of beer distributorships.
Apart from the above analysis regarding contract and statutory construction, in considering whether the amendments violate the Contract Clause, the threshold question is whether the state law has in fact operated as a substantial impairment of a contractual relationship (see Energy Reserves Group, Inc. v Kansas Power & Light Co., 459 US 400, [1983]). An excellent examination of that Supreme Court holding, and explanation of the application of the Contract Clause, is found in Schieffelin & Co. v Department of Liq. Control (194 Conn 165, 177-178, 479 A2d 1191, 1199 [1984]):
“Factors to be weighed are the severity of the impairment, the extent to which it frustrates a party’s reasonable contractual expectations and the extent to which the subject matter of the impairment has been regulated in the past. Id. If the impairment is minimal the inquiry may end at the embryonic stage. If, however, the impairment is severe, the legislation will be subjected to an increased level of scrutiny. Id. On the other hand, no matter how severe the impairment, a state regulation which does no more than restrict a party to gains it reasonably expected from the contract does not necessarily constitute a substantial impairment within the meaning of the contract clause. Moreover, if one buys into an enterprise already regulated in the particular to which he now objects, he *641 buys subject to further legislation upon the same topic.” (Citations omitted.)
As part of this threshold inquiry, the party challenging the law as a substantial impairment of a contractual relationship bears the burden of demonstrating that it in fact possesses contractual rights or obligations altered by the law. Secondly, if a substantial impairment is found, a court must then determine whether the governmental entity had a “significant and legitimate public purpose behind the regulation * * * such as the remedying of a broad and general social or economic problem” (Energy Reserves, 459 US at 411-412). In the third and final stage, the court must determine “whether the adjustment of ‘the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation’s] adoption’ ” (Energy Reserves, 459 US at 412, quoting United States Trust Co. of N.Y. v New Jersey, 431 US 1, 22 [1977]). When considering this last aspect, especially the economic and social regulations, courts properly defer in large measure to the legislative judgment as to the necessity and reasonableness of a particular measure (see Energy Reserves, 459 US at 412-413).
Garal argues that there is a complete absence of a contract right that is being impaired. The primary focus of the Contract Clause is “upon legislation * * * designed to repudiate or adjust pre-existing debtor-creditor relationships that obligors [are] unable to satisfy” (Keystone Bituminous Coal Assn. v DeBenedictis, 480 US 470, 503 [1987] [law affecting express private contracts]). Here, Miller is seeking to use the Contract Clause to strike down a law amending a preexisting law that is expressly incorporated into the contract. Miller’s argument is not that contract rights or obligations are altered by the amendments, but that the amendments do what amendments are intended to do, that is, alter the preexisting law. As the Supreme Court observed in Exxon Corp. v Eagerton (462 US 176, 190 [1983]):
“The Contract Clause does not deprive the States of their ‘broad power to adopt general regulatory measures without being concerned that private contracts will be impaired, or even destroyed, as a result.’ United States Trust Co. v. New Jersey, [431 US 1, 22 (1977)]. As Justice Holmes put it: ‘One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them. The *642 contract will carry with it the infirmity of the subject matter.’ Hudson Co. v McCarter, 209 U.S. 349, 357, 28 S.Ct. 529, 531, 52 L.Ed. 828 (1908).”
As set forth above, only a substantial impairment will require further analysis. In United States Trust Co. v New Jersey (431 US 1, 20-21 n 17 [1977]), the Court explained the analysis as:
“a more particularized inquiry into the legitimate expectations of the contracting parties. The parties may rely on the continued existence of adequate statutory remedies for enforcing their agreement, but they are unlikely to expect the state law will remain entirely static. Thus, a reasonable modification of statutes governing contract remedies is much less likely to upset expectations than a law adjusting the express terms of an agreement.”
Here, as noted, Miller contracted in a “heavily regulated” area, and could not justifiably rely on the continuity of the statutory scheme (see Troy Ltd. v Renna, 727 F2d 287, 297 [3d Cir 1984] [a statutory extension of a preexisting statutory tenancy was “probably not an impairment at all” since the landlord “ ‘purchased into an enterprise already regulated in the particular to which he now objects’ ” and could not justifiably expect that no amendment would occur], quoting Veix v Sixth Ward Bldg. & Loan Assn. of Newark, 310 US 32, 38 [1940]; Energy Reserves, 459 US at 416 [when a statute changed already regulated natural gas prices, “reasonable expectations have not been impaired”]; see also Empire Distribs. of Carolinas, Inc. v Heublein Wines, 1985 WL 17505, *4, 1985 US Dist LEXIS 23799, *12 [ED NC] [“although North Carolina’s ABC laws did not contain a ‘just cause’ termination provision in 1975 when the contract was executed, it was foreseeable that the North Carolina General Assembly might pass such a provision as part of its ABC laws”]; cf. Peoples Sav. Bank of Yonkers, N.Y. v County Dollar Corp., 43 AD2d 327 [2d Dept 1974] [attempted retroactive application of newly adopted legislation, where there was no prior statute, was unconstitutional]). The instant case is not one where a supplier’s right to terminate at-will contracts with its wholesalers has been impaired by retroactive application of a new statute (see Heublein, Inc. v Department of Alcoholic Beverage Control of Commonwealth of Va., 237 Va 192, 376 SE2d 77 [1989]). Here, as in Veix (310 US at 38), Miller “purchased subject to further legislation upon the same topic.” The challenged *643 legislatively created rights, set forth in Alcoholic Beverage Control Law § 55-c, are not protected by the Contract Clause.
In Schieffelin & Co. (194 Conn 165, 479 A2d 1191), the severity of the impairment was more severe than that facing Miller in the instant case. In that case, the statute imposed a “just cause” requirement for termination of certain contractual relationships theretofore terminable at will, by reducing the durational period one holds a distributorship from 24 months to six months. Yet, the court (194 Conn at 181-182, 479 A2d at 1201) held “[i]t was therefore reasonably foreseeable that the twenty-four month distributorship as a requirement for just cause termination would not remain static and, in all likelihood, would be reduced.”
From the above, the court finds that the Contract Clause protects only expectations of the parties to the contract arising from mutual assent. Here, the parties agreed to be bound to “differing termination notice periods, procedures, or justifications,” set forth in state or local laws. This is simply not the kind of expectation the Contract Clause was intended to protect. In New York, the termination procedures for beer distributorships is wholly a creature of statute, not contract (see e.g. Medical Malpractice Ins. Assn. v Cuomo, 74 NY2d 651 [1989]). Here, Miller nor the court is able to identify a contract right that is impaired by the challenged amendment. Certainly, at the time Miller sent its termination notice it expected the Legislature to amend the statute, which amendment was awaiting the Governor’s signature. Moreover, even at time of assumption of the contract in 1999, the possibility that the statutory termination procedures would be modified was a real expectation. The court holds that the remedial amendment did not impair any contract-based expectation. In any event, whether or not the Contract Clause claim is disposed of by virtue of paragraph 15 (B) of the distributor agreement that expressly recognizes the existence of extensive regulation and incorporates same into the contract, it does suggest that Miller knew that its contractual rights were subject to alteration by state law (see Energy Reserves, 459 US at 416).
The cases relied upon by Miller, on pages 10 through 11 of its memorandum of law, involved situations where newly enacted legislation was sought to be applied to preexisting contracts that did not discuss the length of their relationship or the conditions for terminating same (see e.g. Birkenwald Distrib. Co. v Heublein, Inc., 55 Wash App 1, 7, 776 P2d 721, 725 [1989] [“would not simply supplement their agreement, it *644 would revise it; it would impose obligations without regard to the parties’ intent”]).
Due to the preexisting regulation of the area at issue, Miller had reason to anticipate that the Legislature would make the rather modest remedial changes that do not rise to the level of drastic, unanticipated changes that would satisfy the analysis of a substantial impairment. Here, the impairment is minimal and the inquiry may end at the first stage of the Contract Clause inquiry (see Allied Structural Steel Co. v Spannaus, 438 US 234, 245 [1978] [“Minimal alteration of contractual obligations may end the inquiry at its first stage”]; Chrysler Corp. v Kolosso Auto Sales, Inc., 148 F3d 892, 897 [7th Cir 1998], cert denied 525 US 1177 [1999] [“a contractual obligation is not impaired within the meaning that the modern cases impress upon the Constitution if at the time the contract was made the parties should have foreseen the new regulation challenged under the clause”]; see also Hockman, The Supreme Court and the Constitutionality of Retroactive Legislation, 73 Harv L Rev 692 [1960]).
In light of the court’s holding, there is no need to examine the remaining two stages of significant and legitimate public purpose behind the regulation and whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation’s adoption. In any event, if the inquiry is framed as entailing an “overall determination of reasonableness” (United States Trust Co., 431 US at 22 n 19), in light of the fact that courts are required to defer to the Legislature’s judgment concerning the necessity and reasonableness of economic and social legislation, reasonableness is amply demonstrated in the legislative Bill Jacket of the challenged amendments.
Under this “reasonableness” inquiry, the courts have recognized a legislature’s right to cure a court’s erroneous interpretation of a statute retroactively to pending cases (see Canisius Coll. v United States, 799 F2d 18, 27 [2d Cir 1986]; Battaglia v General Motors Corp., 169 F2d 254, 259-261 [2d Cir]; Rudewicz v Gagne, 22 Conn App 285, 288, 582 A2d 463, 465 [1990] [“An act that has been passed to clarify an existing statute, that is, one that was passed shortly after controversies arose as to the judicial interpretation of the original act, is also to be applied retroactively”]). In this case, in light of the decision of Justice Owen in Oak Beverages, Inc. v Heineken USA, Inc. in Supreme Court, Orange County, the retroactive cura *645 tive amendments are supported by a public purpose and do not effect an unreasonable accommodation between the public interest and contractual expectations (see Matter of Gleason, 96 NY2d at 122, supra [including in the retroactivity analysis “whether the statute was designed to rewrite an unintended judicial interpretation”]). Therefore, even if the amendments could be said to impair contract-based expectations, it did not do so in violation of the Contract Clause.
Miller’s reliance upon the Sixth Circuit’s holding in Bob Tatone Ford, Inc. v Ford Motor Co. (197 F3d 787 [6th Cir 1999]) is misplaced. First, the “good cause” provisions of the Ohio Motor Vehicle Dealers Act (Ohio Rev Code Ann § 4517.54 [A]) were enacted well after the execution of the contract at issue, and those provisions impaired substantive rights. Secondly, the holding was based upon a violation of article II, § 28 of the Ohio Constitution, which states, in part, that “[t]he general assembly shall have no power to pass retroactive laws, or laws impairing the obligation of contracts [.]” No similar prohibition exists in the New York Constitution. Additionally, unlike the amendments before this court, in Landgraf v USI Film Prods. (511 US 244, 286 [1994]), another case relied upon by Miller, the Supreme Court “found no clear evidence of congressional intent that § 102 of the Civil Rights Act of 1991 should apply to cases arising before its enactment.”
The court rejects the claim that the amendment constitutes special interest legislation (see Energy Reserves, 459 US at 417 n 25 [“Given the nature of the industry * * * it is impossible for any regulation not to have a major effect on a small number of participants”]; see e.g. Lochner v New York, 198 US 45, 68 [1905] [Harlan, White, and Day, JJ., dissenting] [“(i)f there be doubt as to validity of the statute, that doubt must therefore be resolved in favor of its validity, and the courts must keep their hands off, leaving the legislature to meet the responsibility for unwise legislation”]).
The court’s determination is supported by an examination of the legislative Bill Jacket accompanying the Legislature’s original enactment and the challenged amendments. Courts have often relied, cautiously, upon memoranda issued contemporaneously with the passing and signing of a statute in seeking to ascertain legislative intent (see Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d at 585 [“In an analysis of retroactive application, we have found it relevant when the [legislation] * * * is to clarify what the law was always meant to say and do”]; Matter of Knight-Ridder Broadcasting v Greenberg, *646 70 NY2d 151, 158 [1987]; Matter of Greer v Wing, 95 NY2d 676 [2001]; Matter of OnBank & Trust Co., 90 NY2d 725, supra; Matter of Duell, 84 NY2d at 783-784, supra). A review of the correspondence surrounding the 1996 enactment of Alcoholic Beverage Control Law § 55-c reveals that “[t]his legislation is designed to provide a more equitable framework for the business dealings between beer brewers and importers and their wholesalers” and designed to protect wholesalers “from arbitrary termination and denial of the appointment of their successors” (see Governor’s Bill Jacket, L 1996, ch 679, at 4). The Governor’s Executive Memorandum of Approval, dated September 25, 1996, expressly states that future amendments would be offered and he instructed “the State Liquor Authority to monitor closely the implementation of this legislation and to suggest statutory and regulatory modifications where necessary and appropriate” (see Governor’s Bill Jacket, L 1996, ch 679, at 14). The correspondence shows that Miller favored the legislation, particularly “the concept of the adoption or implementation of a national or regional policy of consolidation” (see Governor’s Bill Jacket, L 1996, ch 679, at 54; see also at 25, 33, 37, 57, 58, 64, 72). In fact, the defaulting defendant in this action, Boening Bros., Inc., wrote the Governor in favor of the legislation to combat “unfair termination of a wholesaler by a supplier” (see Governor’s Bill Jacket, L 1996, ch 679, at 131).
The 1997 correction amendment addressed some of the concerns raised by the Governor’s Executive Memorandum in 1996 and the concerns of small brewers (see Governor’s Bill Jacket, L 1997, ch 612, at 5).
As for the challenged amendments, the Governor’s Executive Memorandum of Approval, dated September 19, 2001, acknowledges that “[t]he purpose of this bill is to address perceived ambiguities in current law concerning definitions of ‘region’ and ‘reasonable compensation,’ which have been highlighted in a recent court ruling (Oak Beverages v Heineken USA, Inc., Index No. 7757/00, NYS Supreme Court, Orange Co.)” (see Governor’s Bill Jacket, L 2001, ch 346, at 4). While offering that “the bill as written goes [too] far in shifting the balance of bargaining power into the hands of one party to a franchise agreement” the Governor does concede the intention of “clarifying ambiguities and closing apparent loopholes in the law” (id.).
As noted above, retroactivity was addressed in the September 7, 2001 letter of Assembly Majority Leader, Paul A. Tokasz, *647 and the September 5, 2001 letter of the Senate sponsor, Owen H. Johnson. The concern and reaction to the Oak Beverages (supra) decision is reflected throughout the Bill Jacket (see Governor’s Bill Jacket, L 2001, ch 346, at 11 [“a recent court decision has brought about a result unintended by the legislature in its adoption of section 55-c”]; see also at 14, 32). While Miller, and other brewers, sought a veto of the amendments (see Governor’s Bill Jacket, L 2001, ch 346, at 18-20, 49, 52-62), the Governor approved the amendments, with his expressed reservations.
In all, the Bill Jacket supports the court’s determination that the amendments are remedial in nature, that they constitute a minimal alteration of contractual obligations, that the possibility that the statutory termination procedures would be modified was a real expectation upon a review of the various Bill Jackets, that Miller could not justifiably expect that no amendment would occur in light of an unexpected judicial determination, that the amendments were designed to rewrite an unintended judicial interpretation, that the amendments reaffirm a legislative judgment about what the law in question should be, and that the amendments do not impair contract-based expectations in violation of the Contract Clause.
Retroactive application of the statute in this case would not substantially alter the vested contract rights of the parties or impose unanticipated consequences. The amendments do not abridge legitimate expectations which the parties reasonably relied upon in contracting. The court concludes that it “may not lightly alter this legitimate exercise of legislative prerogative” (Castro v United Container Mach. Group, 96 NY2d 398 [2001]).
Finally, the pleadings raise an interesting issue of whether or not Miller is aggrieved by the retroactive application of the amendments. In footnote 4, on page 3 of its memorandum of law, Miller claims that it “has complied with the amended version of Section 55-c.” Additionally, with denials in Miller’s answer at paragraphs 25 through 28, refuting the allegations that Miller had failed to comply with the law as amended, it appears that Miller’s position is that it complied with the amended law. As to the compensation requirement under the new amendments, Miller states that it has offered to pay Garal an amount of money sufficient to satisfy any financial obligations it may have to Garal pursuant to Alcoholic Beverage Control Law § 55-c, but that Garal has refused to accept such payment. However, in light of the court’s holding, this issue *648 and the argument that the termination was not effective until well after the amendments were signed into law, need not be addressed at this time.
Accordingly, the motion dismissing and striking Miller’s first affirmative defense is granted.

. The termination has been stayed by a temporary restraining order dated November 8, 2001 (Loughlin J.). By stipulation between the parties, the temporary restraining order remains in place.

. In the legislative memorandum of the Senate sponsor of the original legislation, as enacted in 1996, State Senator Ronald B. Stafford wrote: “[Beer] wholesalers expend considerable time, money and effort in building equity in the brands they sell. This legislation recognizes the value of that equity and protects them from arbitrary termination and denial of the appointment of their successors” (see 1996 NY Legis Ann, at 504).

. Before oral argument, the court requested that the parties provide the legislative Bill Jacket from the New York Legislative Service, Inc. concerning the statute and amendments at issue. The court was provided with the Governor’s Bill Jacket, Laws of 2001 (ch 346 [64 pages]), the Assembly Debate Transcripts, Laws of 2001 (ch 346 [6 pages]), the Governor’s Bill Jacket, Laws of 1997 (ch 612 [9 pages]), the Senate Debate Transcripts, Laws of 1997 (ch 612 [6 pages]), the Governor’s Bill Jacket, Laws of 1996 (ch 679 [157 pages]), and the Senate Debate Transcripts, 1996 NY Senate Bill S 5410 — B/ A6458-C (5 pages). All have been added to the record of this motion.