EDER BROTHERS, INC., ET AL. *v.* WINE MERCHANTS
OF CONNECTICUT, INC.
(SC 17382)

Sullivan, C. J., and Borden, Katz, Palmer and Zarella, Js.

---

Argued April 15—officially released September 6, 2005

*Charles D. Ray*, with whom were *David A. Reif* and, on the brief, *Salvatore N. Fornaciari*, for the appellants (plaintiffs).

*Jeffrey J. Mirman*, for the appellee (defendant).

*Opinion*

KATZ, J. The present case involves an action by the plaintiffs, Eder Brothers, Inc., Alan S. Goodman, Inc., Brescome Barton, Inc., Mid State Distributors, LLC, Hartley and Parker, Inc., and Connecticut Distributors, Inc., who are wholesale wine distributors, against the defendant, Wine Merchants of Connecticut, Inc., a competitor in the wholesale wine distribution business, seeking money damages and injunctive relief on the ground that certain of the defendant's practices violate the Liquor Control Act, General Statutes § 30-1 et seq., and the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. Specifically, the plaintiffs alleged that the defendant's practice of shrink-wrapping 180 bottles of 1.5 liter Redwood Creek brand wine on a pallet, surrounding the bottles with cardboard, and then posting a "jumbo case" per bottle sale price with the department of consumer protection (department) when the palletized case was not a "case," as that term is defined by General Statutes § 30-1 (6),[1] constituted an illegal offering of quantity

[1] General Statutes § 30-1 provides in relevant part: "For the interpretation of this chapter, unless the context indicates a different meaning . . .

"(6) (A) 'Case price' means the price of a container of cardboard, wood or other material, containing units of the same size, brand, age and proof of alcoholic liquor, and (B) a case of alcoholic liquor, other than beer, cordials, cocktails, wines and prepared mixed drinks, shall be in the number and quantity of units or bottles as follows: Three gallon bottles; four gallon bottles; six half-gallon bottles; twelve quart bottles or twelve liter bottles; twelve one-fifth gallon bottles or twelve seven hundred fifty milliliter bottles; twenty-four pint bottles; twenty-four one-tenth gallon bottles or six and four-tenths ounce bottles or twenty-four three hundred seventy-five milliliter bottles or forty-eight one hundred eighty-seven and one-half milliliter bottles; ninety-six one hundred milliliter bottles; forty-eight half-pint bottles, or two hundred forty-one and one-half ounce, one and six-tenths ounce and two

discounts in violation of General Statutes § 30-94 (a).[2] Additionally, the plaintiffs alleged that, because the defendant offered the "jumbo case" to only a select group of retailers, it violated General Statutes § 30-64a.[3] Finally, the plaintiffs alleged that the defendant's con-

ounce bottles or ninety-six ninety-three and seven-tenths milliliter bottles or one hundred ninety-two forty-six and eight-tenths milliliter bottles. . . ."

[2] General Statutes § 30-94 provides: "(a) No permittee or group of permittees licensed under the provisions of this chapter, in any transaction with another permittee or group of permittees, shall directly or indirectly offer, furnish or receive any free goods, gratuities, gifts, prizes, coupons, premiums, combination items, quantity prices, cash returns, loans, discounts, guarantees, special prices or other inducements in connection with the sale of alcoholic beverages or liquors. No such permittee shall require any purchaser to accept additional alcoholic liquors in order to make a purchase of any other alcoholic liquor.

"(b) Notwithstanding the provisions of subsection (a) of this section and subsection (b) of section 30-63, a holder of a manufacturer permit issued under subsection (a) of section 30-16 or an out-of-state shipper's permit for alcoholic liquor other than beer issued under section 30-18 may offer and provide to a holder of a wholesaler permit issued under subsection (a) of section 30-17 a floor stock allowance or a depletion allowance, or both, with the prior approval of the department. Such allowances shall be offered and provided on a nondiscriminatory basis to all such wholesaler permittees authorized to distribute the products of any such manufacturer or out-of-state shipper permittee in accordance with such requirements as the department may prescribe by regulation adopted under chapter 54, provided (1) no such manufacturer or out-of-state shipper permittee may require any such wholesaler permittee to participate in any program providing such allowances, and (2) the rate or percentage used to calculate any such allowance may not vary based on the quantity of alcoholic liquor other than beer that is sold. As used in this subsection, 'floor stock allowance' means any rebate, discount or other inducement that is given to a wholesaler permittee to be used for the sales promotion or the destruction of any alcoholic liquor other than beer that is stored in the wholesaler permittee's warehouse or other storage facilities at the time such rebate, discount or other inducement is given, and 'depletion allowance' means any rebate, discount or other inducement used for the sales promotion of any alcoholic liquor other than beer that is given to a wholesaler permittee based on the amount of such alcoholic liquor subject to such promotion that is sold at wholesale by the wholesaler permittee."

[3] General Statutes § 30-64a provides: "Notwithstanding any provision of the general statutes or any regulations issued pursuant thereto to the contrary, a wholesaler, who sells any product or is authorized to sell any product by this chapter, shall sell such product to each retail permittee in

duct amounted to unfair trade practices in violation of General Statutes § 42-110b.[4]

The defendant moved to dismiss the action on four grounds: (1) the trial court lacked personal jurisdiction over the defendant because of untimely service of process; (2) the plaintiffs lacked standing to bring the action; (3) the department has exclusive jurisdiction over alleged violations of liquor control statutes; and (4) the plaintiffs had failed to exhaust administrative remedies available through the department. The trial court rendered judgment dismissing the action on the second and third grounds raised, concluding that "regardless of the interest of the plaintiffs as competitors of the defendant, the plaintiffs lack standing to maintain this action because there is no statute that permits them to sue the defendant for violation of the

the wholesaler's geographic territory who desires to purchase such product. Such wholesaler shall not charge any retail permittee, to whom the wholesaler is required to sell by virtue of this section, a different rate for the delivery or transportation of any alcoholic liquor than such wholesaler would charge any other retail permittee. Where distance, road conditions, travel time or any such factor substantially affects the cost of delivery or transportation of a product sold by a wholesaler, the wholesaler shall file a schedule of proposed delivery charges with the [department]. Such schedule shall only apply after a hearing by and upon written approval from said department."

[4] General Statutes § 42-110b provides: "(a) No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

"(b) It is the intent of the legislature that in construing subsection (a) of this section, the commissioner [of consumer protection] and the courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act (15 USC 45[a][1]), as from time to time amended.

"(c) The commissioner may, in accordance with chapter 54, establish by regulation acts, practices or methods which shall be deemed to be unfair or deceptive in violation of subsection (a) of this section. Such regulations shall not be inconsistent with the rules, regulations and decisions of the [F]ederal [T]rade [C]ommission and the federal courts in interpreting the provisions of the Federal Trade Commission Act.

"(d) It is the intention of the legislature that this chapter be remedial and be so construed."

liquor pricing laws. Enforcement of these statutes in a civil context lies solely with the [department]. Moreover, couching their claim as one under [CUTPA] does not save their claim, since the claimed violations are ones that arise under the liquor pricing laws, over which the legislature has determined that the [department] shall have exclusive jurisdiction." The plaintiffs then appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

On appeal, the plaintiffs claim that the trial court improperly determined that it did not have jurisdiction to consider either their claim alleging a CUTPA violation or their claim alleging a violation of the Liquor Control Act. In addition to defending the trial court's judgment, the defendant contends that, even if we were to agree with the plaintiffs' claims, we should affirm the judgment nonetheless based on the alternate grounds that the plaintiffs had failed to exhaust their administrative remedies and failed to join the department as an indispensable party. We reject the plaintiffs' claim that the trial court improperly determined that it lacked subject matter jurisdiction over the claimed violations of the Liquor Control Act. We agree with the plaintiffs, however, that the trial court improperly dismissed their claim under CUTPA.

I

The plaintiffs' claims both implicate the issue of standing. We begin, therefore, with our well settled principles dictating the nature of that inquiry. "The issue of standing implicates this court's subject matter jurisdiction." *Fish Unlimited* v. *Northeast Utilities Service Co.*, 254 Conn. 21, 31, 755 A.2d 860 (2000), overruled in part on other grounds, *Waterbury* v. *Washington*, 260 Conn. 506, 545, 800 A.2d 1102 (2002); *Steeneck* v.

*University of Bridgeport*, 235 Conn. 572, 580, 668 A.2d 688 (1995) ("[w]here a plaintiff lacks standing to sue, the court is without subject matter jurisdiction"). "Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he [or she] has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. . . . *Gay & Lesbian Law Students Assn.* v. *Board of Trustees*, 236 Conn. 453, 466, 673 A.2d 484 (1996). When standing is put in issue, the question is whether the person whose standing is challenged is a proper party to request an adjudication of the issue . . . . *Malerba* v. *Cessna Aircraft Co.*, 210 Conn. 189, 192, 554 A.2d 287 (1989). Standing requires no more than a colorable claim of injury; a [party] ordinarily establishes . . . standing by allegations of injury. Similarly, standing exists to attempt to vindicate arguably protected interests. . . . *Gay & Lesbian Law Students Assn.* v. *Board of Trustees*, supra, 466." (Internal quotation marks omitted.) *State* v. *DeCaro*, 252 Conn. 229, 253–54, 745 A.2d 800 (2000).

Standing is established by showing that the party claiming it is authorized by statute to bring an action, in other words statutorily aggrieved, or is classically aggrieved. *Sleeneck* v. *University of Bridgeport*, supra, 235 Conn. 579. "The fundamental test for determining [classical] aggrievement encompasses a well-settled twofold determination: [F]irst, the party claiming aggrievement must successfully demonstrate a specific, personal and legal interest in [the challenged action], as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the [challenged action]." (Internal quotation marks omit-

ted.) Id. "Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." (Internal quotation marks omitted.) *Pomazi* v. *Conservation Commission*, 220 Conn. 476, 483, 600 A.2d 320 (1991).

"Statutory aggrievement exists by legislative fiat, not by judicial analysis of the particular facts of the case. In other words, in cases of statutory aggrievement, particular legislation grants standing to those who claim injury to an interest protected by that legislation." (Internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC* v. *Alves*, 262 Conn. 480, 487, 815 A.2d 1188 (2003). A statute need not specifically provide that certain persons come within its protection in order to establish aggrievement as long as that protection may be implied fairly. *Buchholz's Appeal from Probate*, 9 Conn. App. 413, 421–22, 519 A.2d 615 (1987); see, e.g., *Tomlinson* v. *Board of Education*, 226 Conn. 704, 721, 629 A.2d 333 (1993).

## II

We first address the plaintiffs' claim that the trial court improperly determined that they lacked standing to bring a private right of action for claimed violations of the Liquor Control Act. The plaintiffs claim that the statutory framework governing conduct of wine distributors under that act demonstrates that the legislature intended to confer upon them standing to challenge the alleged violations. The defendant contends that the enforcement of the Liquor Control Act is vested exclusively within the department and that no private right of action to enforce its provisions exists. We agree with the defendant.

Although the plaintiffs do not state expressly the ground on which they assert standing, their claim— that the statutory framework of the Liquor Control Act

demonstrates that the legislature intended to create a private cause of action conferring standing upon them to challenge the claimed violations—sounds in statutory aggrievement.[5] The issue, therefore, is whether the Liquor Control Act establishes standing for the plaintiffs in their capacities as competitors by creating an arguably protected interest, within the meaning of the statute. We disagree that the statute confers such a right.

Whether the plaintiffs are statutorily aggrieved under the Liquor Control Act is a question of statutory interpretation. *Carmel Hollow Associates Ltd. Partnership v. Bethlehem*, 269 Conn. 120, 129, 848 A.2d 451 (2004). Our legislature recently has enacted General Statutes § 1-2z, which provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." In the present case, neither of the parties claim that the Liquor Control Act yields a plain

---

[5] Even if we were to assume, arguendo, that the gravamen of the plaintiffs' claim rests not on statutory aggrievement, but rather, on the basis of classical aggrievement by virtue of the defendant's failure to comply with the Liquor Control Act, "we consider the purpose of [that act], as reflected in [its] language and legislative history" to determine whether they satisfy that doctrine's requirements. *Edgewood Village, Inc.* v. *Housing Authority*, 265 Conn. 280, 288, 828 A.2d 52 (2003); see *Harris* v. *Zoning Commission*, 259 Conn. 402, 414, 788 A.2d 1239 (2002) (practical impact of zoning amendment on property owners sufficient to satisfy first prong of classical aggrievement test of personal legal interest despite application of amendment to residents generally); *Bright* v. *Zoning Board of Appeals*, 149 Conn. 698, 704, 183 A.2d 603 (1962) (property owners beyond scope of statutory aggrievement established specific, personal interest in zoning variance granted to neighboring country club). For reasons explained later in this opinion, the purpose of the Liquor Control Act is to regulate the sale and consumption of alcohol for the protection of the public, not for the economic benefit of a particular wholesaler, and any claim that the plaintiffs are classically aggrieved similarly would fail.

and unambiguous answer to the question of whether it conveys a private right of action. Indeed, that act is silent with respect to that question. Accordingly, our analysis is not limited, and we, therefore, apply "our well established process of statutory interpretation, under which we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *DeOliveira* v. *Liberty Mutual Ins. Co.*, 273 Conn. 487, 498 n.7, 870 A.2d 1066 (2005).

The allegations of the plaintiffs' complaint with regard to the Liquor Control Act are predicated on violations of §§ 30-64a and 30-94 (a). Section 30-64a provides: "Notwithstanding any provision of the general statutes or any regulations issued pursuant thereto to the contrary, a wholesaler, who sells any product or is authorized to sell any product by this chapter, shall sell such product to each retail permittee in the wholesaler's geographic territory who desires to purchase such product. Such wholesaler shall not charge any retail permittee, to whom the wholesaler is required to sell by virtue of this section, a different rate for the delivery or transportation of any alcoholic liquor than such wholesaler would charge any other retail permittee. Where distance, road conditions, travel time or any such factor substantially affects the cost of delivery or transportation of a product sold by a wholesaler, the wholesaler shall file a schedule of proposed delivery charges with the [department]. Such schedule shall only apply after

a hearing by and upon written approval from said department." Section 30-94 (a) provides: "No permittee or group of permittees licensed under the provisions of this chapter, in any transaction with another permittee or group of permittees, shall directly or indirectly offer, furnish or receive any free goods, gratuities, gifts, prizes, coupons, premiums, combination items, quantity prices, cash returns, loans, discounts, guarantees, special prices or other inducements in connection with the sale of alcoholic beverages or liquors. No such permittee shall require any purchaser to accept additional alcoholic liquors in order to make a purchase of any other alcoholic liquor." It is evident that these two statutes simply prescribe certain conduct by distributors and do not expressly authorize any private enforcement mechanism. Indeed, the only provision in the Liquor Control Act that expressly does authorize a private right of action is General Statutes § 30-102, more commonly known as the Dram Shop Act.[6] See *Craig* v. *Driscoll*, 262 Conn. 312, 813 A.2d 1003 (2003) (discussing civil action under Dram Shop Act). By contrast, in the provisions under which the plaintiffs seek relief, there is no such express reference and the only implicit reference to an enforcement mechanism is one by the department, not by competing wholesalers.

That the department is intended to be the sole enforcer of the Liquor Control Act except where expressly provided is further evidenced by other provisions of that act. General Statutes § 30-6 (a) provides in relevant part: "The [department] shall enforce the provisions of this chapter. . . . It may generally do whatever is reasonably necessary for the carrying out

---

[6] General Statutes § 30-102 provides in relevant part: "If any person, by such person or such person's agent, sells any alcoholic liquor to an intoxicated person, and such purchaser, in consequence of such intoxication, thereafter injures the person or property of another, such seller shall pay just damages to the person injured, up to the amount of two hundred fifty thousand dollars . . . to be recovered in an action under this section . . . ."

of the intent of this chapter; and, without limiting its authority, it may call upon other administrative departments of the state government and of municipal governments, upon state and municipal police departments and upon prosecuting officers and state's attorneys for such information and assistance as it deems necessary to the performance of its duties." General Statutes § 30-6a (a) further provides: "The [department] may adopt in accordance with the provisions of chapter 54 all necessary regulations, subject to the provisions of subsection (c) of this section, to: (1) Carry out, enforce and prevent violation of the provisions of this chapter, (2) inspect permit premises, (3) ensure sanitary conditions, (4) ensure proper, safe and orderly conduct of permit premises, and (5) protect the public against fraud or overcharge." Finally, General Statutes § 30-8 provides in relevant part: "The [department] and any agent thereof authorized to conduct any inquiry, investigation or hearing under the provisions of this chapter shall have power to administer oaths and take testimony under oath relative to the matter of inquiry or investigation. . . ." These statutes clearly delegate all executive, legislative and adjudicatory functions and powers related to the Liquor Control Act to the department. Thus, the Liquor Control Act reflects that the legislature intended to convey the duty of enforcing that act exclusively to the department, except where otherwise expressly stated.

The legislative history of §§ 30-6 and 30-6a similarly indicates an intent to vest exclusive control with the department. Number 80-482, § 191, of the 1980 Public Acts (P.A. 80-482), established the division of liquor control as an independent department, and No. 95-195 of the 1995 Public Acts (P.A. 95-195) substituted the department of consumer protection for the department of liquor control as the body charged with enforcing the Liquor Control Act. In discussing P.A. 80-482, Repre-

sentative John J. Zajac, Jr., stated: "All one has to do is really look at the liquor statutes and all its regulations, many of which we debate here each and every year, whether we agree with some and disagree with others, we would have to all admit that its all encompassing under one [c]ommission and one [r]egulatory [a]gency." 23 H.R. Proc., Pt. 17, 1980 Sess., p. 5068. In explaining the purpose and benefit of P.A. 95-195 in committee hearings, Mark Shiffrin, the commissioner of consumer protection, elaborated on the duties of the department of liquor control, soon to be transferred to the department of consumer protection: "The [d]epartment of [l]iquor [c]ontrol is responsible for the protection of public health and safety through the regulation and control of liquor. Specific responsibilities that directly are analogous to those of the [d]epartment of [c]onsumer [p]rotection, are determining the suitability of applicants and premises . . . upon the receipt of liquor license applications. *The investigation and adjudication of alleged violations, and preventing fraud and unfair trade or illegal trade practices.* . . . [S]imilar functions . . . are performed by the [d]epartment of [c]onsumer [p]rotection for a wider range of product services and activities. This is a sensible consolidation of functions." (Emphasis added.) Conn. Joint Standing Committee Hearings, General Law, Pt. 3, 1995 Sess., p. 798. The absence of any discussion of private enforcement by way of private causes of action and the emphasis on the department of consumer protection's control in the legislative history recited previously in this opinion lends further support to the conclusion that the legislature intended that the enforcement of the Liquor Control Act be vested within one administrative body, and that the department of consumer protection is the agency designated to do so.[7]

---

[7] We note that the plaintiffs cite multiple provisions within the Liquor Control Act that allow criminal penalties to be sought and levied by the police, the state's attorney, and the Superior Court, for the proposition that the department is not the sole enforcer of that act. See General Statutes §§ 30-

Moreover, the plaintiffs seek to establish standing *in their capacities as competitors* and, therefore, must establish that the Liquor Control Act created an arguably protected interest for such a class. Although the legislative history of §§ 30-64a and 30-94 also is silent with respect to private rights of action, this court previously has evaluated the purpose of these statutes and other provisions within the Liquor Control Act that bear on this issue. This court previously has stated that a primary purpose of regulating pricing practices within the liquor industry is to prevent unfair competition, but the court further has determined that the reason for preventing that competition is because of the potential harm to the public.[8] See *Slimp* v. *Dept. of Liquor Control,* 239 Conn. 599, 611–13, 687 A.2d 123 (1996); *Schwartz* v. *Kelly,* 140 Conn. 176, 180, 99 A.2d 89, appeal dismissed, 346 U.S. 891, 74 S. Ct. 227, 98 L. Ed. 394 (1953). "Although the act . . . does not contain a statement of the objects sought to be accomplished, the

101, 30-105, 30-106, 30-107, 30-113 and 30-115. Although these provisions do afford certain enforcement powers to the police, the state's attorney, and the Superior Court, those powers only allow those parties to enforce the Liquor Control Act in the criminal context. In the present case, the plaintiffs seek to enforce the Liquor Control Act in a private, civil action. The mere fact that the department shares enforcement power under the Liquor Control Act for criminal purposes does not alter the department's exclusive jurisdiction over alleged violations of that act that are purely civil in nature.

[8] In *Schieffelin & Co.* v. *Dept. of Liquor Control,* 194 Conn. 165, 183, 479 A.2d 1191 (1984), we also stated that another purpose of regulating pricing practices within the liquor industry is to prevent "out-of-state shippers from dominating Connecticut wholesalers." We note that the plaintiffs rely on this language for the proposition that they have standing to bring their claim under the Liquor Control Act because the defendant is working in conjunction with an out-of-state shipper to violate that act to the detriment of Connecticut wholesalers. This reliance is misplaced. Our language in *Schieffelin & Co.* refers to the negative impact of the conduct of an out-of-state shipper on Connecticut wholesalers. Id., 181–83. In the present case, while the actual product does come from an out-of-state shipper, it is the conduct of the defendant, a Connecticut wholesaler, in distributing that product, rather than that of the out-of-state shipper, that allegedly has harmed the plaintiffs.

purposes which the General Assembly had in mind in adopting it are easily discernible. They were both to promote temperance in the consumption of intoxicating liquor and, by stabilizing the industry, to encourage observance of the Liquor Control Act by those who are permitted to sell liquor not to be consumed on the premises. *It may reasonably be presumed that, without the establishment of a minimum retail price for branded liquor, price wars among retail dealers are apt to occur. The cutting of prices which occurs during such wars may induce persons to purchase, and therefore consume, more liquor than they would if higher prices were maintained. Moreover, the cutthroat competition which ensues is apt to induce the retailers to commit such infractions of the law as selling to minors and keeping open after hours in order to withstand the economic pressure. To prevent the occurrence of such conditions promotes public health, safety and welfare.*" (Emphasis added.) *Schwartz* v. *Kelly*, supra, 180. Indeed, when a plaintiff has brought an action challenging the imposition of certain provisions of the Liquor Control Act due to an economic harm to their business, we have explained that the purpose of that act is to regulate the sale and consumption of alcohol for the protection of the public, not for the economic benefit of a particular wholesaler. *All Brand Importers, Inc.* v. *Dept. of Liquor Control*, 213 Conn. 184, 211, 567 A.2d 1156 (1989), citing *Schieffelin & Co.* v. *Dept. of Liquor Control*, 194 Conn. 165, 182–84, 479 A.2d 1191 (1984) ("[i]t is fair to say that the liquor control laws are to be enforced for the benefit of the public and not for the economic benefit of the plaintiff [liquor distributor]"); see also *Slimp* v. *Dept. of Liquor Control*, supra, 613 ("[t]he purpose of § 30-94 was to eliminate incentive or inducement programs that would artificially increase the consumption of alcohol by tying an additional benefit to its purchase"); *Beckanstin* v.

*Liquor Control Commission,* 140 Conn. 185, 192, 99
A.2d 119 (1953) (purpose of statutory provision requir-
ing accurate liquor invoices was to protect public wel-
fare from "danger . . . inherent in the liquor traffic").
Moreover, the lone provision under which the Liquor
Control Act authorizes a private cause of action—the
Dram Shop Act—directly furthers that purpose by dis-
couraging alcohol purveyors from selling alcohol to
intoxicated patrons who may then cause injury to the
public. See *Craig* v. *Driscoll,* supra, 262 Conn. 322–23.

These cases establish that, although the Liquor Con-
trol Act forbids certain pricing practices that could be
harmful to wholesalers, the purpose of preventing that
economic harm is to prevent the resulting harm that
could befall the public. Thus, there is nothing in the
Liquor Control Act reflecting that it is was intended to
protect individual plaintiffs in their capacity as competi-
tors. Accordingly, for all of the foregoing reasons, we
conclude that, absent express language authorizing a
private right of action, the Liquor Control Act does not
convey a private right of action, and that the plaintiffs
cannot, as a matter of law, establish statutory
aggrievement pursuant to that act.[9]

---

[9] Although the plaintiffs rely on *Napoletano* v. *CIGNA Healthcare of Con-
necticut, Inc.,* 238 Conn. 216, 249–50, 680 A.2d 127 (1996), cert. denied, 520
U.S. 1103, 117 S. Ct. 1106, 137 L. Ed. 2d 308 (1997), to support their claim
that the Liquor Control Act implicitly conveys a private right of action, the
present case is markedly different. In *Napoletano,* we stated that, "[i]n
determining whether a private remedy is implicit in a statute not expressly
providing one, several factors are relevant. First, is the plaintiff one of the
class for whose . . . benefit the statute was enacted . . . ? Second, is there
any indication of legislative intent, explicit or implicit, either to create such
a remedy or to deny one? . . . Third, is it consistent with the underlying
purposes of the legislative scheme to imply such a remedy for the plaintiff?"
(Internal quotation marks omitted.) Id., 249. We essentially have discussed
and applied these factors in this opinion and for all of the reasons we have
stated previously, the plaintiffs cannot satisfy this test. Moreover, although
the application of those factors led to the conclusion in *Napoletano* that
the statute in question did convey implicitly a private right of action, a
necessary predicate to our decision was in part that, unlike in the present

## III

The trial court also determined that the plaintiffs lacked standing to bring a CUTPA claim premised upon their allegations that the defendant had violated the Liquor Control Act. The plaintiffs claim that the trial court improperly dismissed their CUTPA count on the basis of its determination that the department's authority to enforce the Liquor Control Act was exclusive, thereby depriving them of a private right of action and the court of subject matter jurisdiction. The defendant contends that the trial court's conclusion was proper because the plaintiffs' CUTPA claim is predicated upon alleged violations of the Liquor Control Act, which does not convey a private right of action to those in the plaintiffs' position. Although we concluded in part II of this opinion that the trial court properly had determined that the Liquor Control Act does not convey a private right of action to the plaintiffs, we nonetheless agree with the plaintiffs that the trial court improperly dismissed their CUTPA claim.

Our jurisprudence regarding CUTPA is well settled. It is "remedial in character . . . and must be liberally construed in favor of those whom the legislature intended to benefit." (Citations omitted; internal quotation marks omitted.) *Fink* v. *Golenbock*, 238 Conn. 183, 213, 680 A.2d 1243 (1996). In *Larsen Chelsey Realty Co.* v. *Larsen*, 232 Conn. 480, 496–99, 656 A.2d 1009 (1995), we reaffirmed the principle, first stated in *McLaughlin Ford, Inc.* v. *Ford Motor Co.*, 192 Conn. 558, 566–67, 473 A.2d 1185 (1984), that CUTPA was designed to provide protection to businesses as well as to consumers. "CUTPA is not limited to conduct involving consumer injury . . . . [A] competitor or other business person can maintain a CUTPA cause of action without

case, the legislature had not limited the enforcement of that statute to a particular administrative body. Id., 251.

showing consumer injury." (Internal quotation marks omitted.) *Larsen Chelsey Realty Co.* v. *Larsen,* supra, 496, quoting *McLaughlin Ford, Inc.* v. *Ford Motor Co.,* supra, 566–67. "CUTPA, by its own terms, applies to a broad spectrum of commercial activity. The operative provision of [CUTPA], § 42-110b (a), states merely that '[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.' Trade or commerce, in turn, is broadly defined as 'the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state.' General Statutes § 42-110a (4)." *Larsen Chelsey Realty Co.* v. *Larsen,* supra, 492. The purpose of CUTPA is to protect the public from unfair practices in the conduct of any trade or commerce, "and whether a practice is unfair depends upon the finding of a violation of an identifiable public policy." *Daddona* v. *Liberty Mobile Home Sales, Inc.,* 209 Conn. 243, 257, 550 A.2d 1061 (1988). A CUTPA claim may be brought in the Superior Court by "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b . . . ." General Statutes § 42-110g (a).

Our court previously has evaluated a situation, much like the present case, wherein the plaintiffs had brought a CUTPA claim alleging unfair trade practices by virtue of a violation of another statute that the defendant contended did not convey a private right of action. See *Macomber* v. *Travelers Property & Casualty Corp.,* 261 Conn. 620, 645 and n.14, 804 A.2d 180 (2002) (evaluating plaintiffs' CUTPA claim predicated on violation of provision of Connecticut Unfair Insurance Practices Act, General Statutes § 38a-815 et seq.). In doing so, we

determined that the plaintiffs could use CUTPA as a vehicle through which to bring the claim, regardless of whether the underlying statute conveyed a private right of action that could stand alone. See id., 645 n.14; see also *Conaway* v. *Prestia*, 191 Conn. 484, 491, 493, 464 A.2d 847 (1983) (tenants, who voluntarily paid rent to landlords despite their failure to obtain necessary certificates of occupancy, could not bring action for violations of General Statutes §§ 47a-5 and 47a-57 to recover rent, but could nevertheless bring CUTPA action predicated on such conduct). Indeed, while a violation of another statute *can* serve as the basis for a CUTPA claim, the defendant in the present case does not necessarily have to be found to have violated the Liquor Control Act in order to be found to have violated CUTPA for conduct controlled by the Liquor Control Act. See *Journal Publishing Co.* v. *Hartford Courant Co.*, 261 Conn. 673, 695, 804 A.2d 823 (2002) (noting as one factor under well settled criteria for determining CUTPA violation, "[w]hether the practice, *without necessarily having been previously considered unlawful,* offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness" [emphasis added; internal quotation marks omitted]). This court previously has indicated that a plaintiff may bring a CUTPA claim that is predicated upon the public policy embodied in another statute, irrespective of whether the conduct in question expressly is prohibited by the letter of that statute, so long as the claim is "consistent with the regulatory principles established by the underlying statute." *Mead* v. *Burns*, 199 Conn. 651, 665, 509 A.2d 11 (1986); see *Conaway* v. *Prestia*, supra, 492–93. Similarly, the mere fact that the plaintiffs in the present case lack standing to bring their claim

under the Liquor Control Act does not mean necessarily that the conduct that is the subject of that claim cannot be held to be a violation of the regulatory principles embodied in and underlying that act. Thus, the fact that the Liquor Control Act does not convey a private right of action to the plaintiffs is irrelevant to whether they have standing to bring a CUTPA claim. Accordingly, we conclude that the trial court improperly concluded that the plaintiffs lacked standing to bring their CUTPA claim and that the court lacked jurisdiction to decide that claim.[10]

The judgment of the trial court is affirmed in part and reversed in part and the case is remanded to that court for further proceedings according to law with respect to the CUTPA claim.

In this opinion the other justices concurred.

---

[10] We note that the defendant contends, as alternate grounds for affirming the trial court's judgment, that the plaintiffs failed to exhaust their administrative remedies and failed to join the department as an indispensable party. These claims are without merit. With respect to the first claim, the plaintiffs have no administrative remedy with respect to their CUTPA count because the department does not have jurisdiction over this claim, and it must be brought in the trial court. See General Statutes § 42-110g. With respect to the second claim, we note that "[p]arties have been termed indispensable when their interest in the controversy is such that a final decree cannot be made without either affecting that interest or leaving the controversy in such condition that its final disposition may be inconsistent with equity and good conscience." (Internal quotation marks omitted.) *Hilton* v. *New Haven*, 233 Conn. 701, 722, 661 A.2d 973 (1995). Therefore, it is unlikely that we would consider the department to be an indispensable party. Moreover, our task in the present case is to determine whether the trial court properly concluded that it lacked jurisdiction to adjudicate the plaintiffs' claims. Whether the department is an indispensable party is not pertinent to the claims before us because even if we were to assume, arguendo, that it is, the failure to join an indispensable party is not a jurisdictional defect. *Robinson* v. *Commissioner of Correction*, 258 Conn. 830, 837 n.9, 786 A.2d 1107 (2002). Thus, whether the department is such a party has no bearing on our conclusion that the trial court improperly concluded that it lacked the jurisdiction to decide the plaintiffs' CUTPA claim.