DAPHNE B. NOYES *v.* ANTIQUES AT
POMPEY HOLLOW, LLC, ET AL.
(AC 34430)

Lavine, Beach and Keller, Js.

Argued March 21—officially released July 30, 2013

*Neil Johnson*, for the appellants (defendants).

*Eric H. Rothauser*, with whom, on the brief, was *John L. Bonee III*, for the appellee (plaintiff).

*Opinion*

LAVINE, J. The defendants, Antiques at Pompey Hollow, LLC, and Thomas Degnan, appeal from the judgment of the trial court rendered in favor of the plaintiff, Daphne B. Noyes, following a trial to the court. On appeal, the defendants claim that the court improperly found that they (1) were unjustly enriched and (2) had

violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. The defendants also claim that the court improperly awarded the plaintiff attorney's fees pursuant to CUTPA. We affirm the judgment of the trial court.

The following facts, as found by the court, are relevant to the resolution of this appeal. The plaintiff inherited a large collection of antiques from her parents, who had lived on Martha's Vineyard, Massachusetts. The plaintiff shared her parents' enthusiasm for and knowledge of antiques. When the plaintiff decided to sell some of the antiques, she was referred to Degnan and his business, known as Antiques at Pompey Hollow LLC, located in Ashford. At the plaintiff's request, Degnan twice viewed the plaintiff's antiques on Martha's Vineyard. During Degnan's visit to Martha's Vineyard on October 6, 2008, he and the plaintiff entered into a written consignment contract (contract).[1] Attached to the contract were twelve pages, each containing a list of antiques with low/high value estimates provided by Degnan. Each antique was assigned a lot number, which ranged from 1 to 334. Four of the lots had reserve values, meaning that the plaintiff and Degnan agreed that the lots would not be sold for less than the reserve value. The court found, however, that the list of antiques was incomplete, as the lot numbers skipped from 70 to 186 and from 309 to 320. A line was drawn through lot number 236 with the notation "NFS." The court

[1] The contract provided in part: "#2. Both parties agree that the owner consigns the listed property to [Degnan] for the purpose of being sold at [his] auction.

"#3. Both parties agree that [Degnan] will offer the goods listed in section 2 of this agreement in his autumn 2008 auction to be held in Norwalk, CT. . . .

"#6. Both parties agree that [Degnan] will pay all expenses for the promotion and execution of the sale and that no additional charges for services such as moving and or insurance will be charged to or deducted from proceeds due owners."

found that the plaintiff consigned a total of 333 lots to the defendants. At trial, none of the parties could account for 126 lots.

On October 6, 2008, Degnan packed most of the consigned lots into his van for transport off Martha's Vineyard. The plaintiff made arrangements with a moving concern to have the largest antiques shipped to the defendants.

To sell the plaintiff's antiques, Degnan held an auction on November 21, 2008, in Norwalk. According to Degnan, the auction went poorly, which he attributed to a concurrent stock market "crash." Degnan withheld certain items from the auction in hope of better success later. Sixty-four lots were sold at auction for $6130. Degnan sent the plaintiff a check for $4597.50 as well as a list of lots sold that included the lot number, a description, and the hammer, or sale, price. The defendants retained $1532.50, representing a 25 percent commission, from the proceeds of the auction.[2]

Degnan also sent the plaintiff a letter dated December 1, 2008, which stated: "Please find enclosed results and check for the sales you realized in our [November 21] 2008 auction. We were pleased with the results from those items sold, but would have preferred to sell a good deal more merchandise. I hope you are pleased with the results.

"We will continue to offer your remaining goods at the different venues we engage and will honor any reserves that were in the auction contract. However, as no buyer's premium is charged at a retail sale we charge a commission of one third of the sales price for

---

[2] The contract provided in part: "#4. Both parties agree that [Degnan] will deduct commissions of 25 [percent] of the sales price of merchandise sold, for a hammer price of [$5000] or less, 15 [percent] of the hammer price of merchandise sold for [$5000 to $10,000], 10 [percent] of all merchandise sold for a hammer price of over [$10,000] as compensation for his services."

a direct sale. *Any proceeds due you from such sales will be paid monthly by the [fifth] of the month following the month in which the goods are sold.*

"If you have any questions or concerns, please feel free to call me at any time.

"Thank you for your business . . . /s/" (Emphasis added.)

The court found that the plaintiff did not agree to the terms of further business with the defendants as set forth in Degnan's letter. The plaintiff, however, did not object to the defendants' failure to return her property and continued to inquire, cordially, as to the results of the subsequent auctions Degnan proposed. Degnan also was courteous, but not prompt or thorough in his responses. Degnan mostly supplied the plaintiff with excuses for not keeping her up to date on results of sales, and he did not give her an accounting of what lots had been sold and what remained.

On March 16, 2009, however, Degnan sent the plaintiff a list by lot number of eleven items sold, description, and bid amounts. He indicated a sales total of $2210 and a commission of $224. He sent the plaintiff a check in the amount of $1896. The plaintiff accepted the outcome of the sales. On May 11, 2009, Degnan sent the plaintiff a list of five antiques sold by lot number, description, and bid amount. The total sale was $500. Degnan kept a commission of $125 and sent the plaintiff a check in the amount of $375. Again, the plaintiff accepted the outcome. On June 17, 2009, Degnan sent the plaintiff a list of two items sold without lot numbers; the items sold for $1550. He kept a commission of $312.50 and sent the plaintiff a check for $1237. Once more, the plaintiff accepted the defendants' check. The plaintiff, however, continued to request an accounting of the antiques consigned to the defendants but heard

nothing further from Degnan, except excuses. Degnan finally stopped communicating altogether.[3]

In summary, the court found that as of June, 2009, the defendants reported a total of eighty-two antiques sold. Two-hundred-fifty-one items were unaccounted for. The plaintiff commenced this action on April 27, 2010.[4]

The case was tried to the court on October 13, 2011. At trial, the plaintiff presented a list of 141 antiques that were missing or sold incorrectly, most with lot numbers. The plaintiff estimated the value of the

---

[3] The plaintiff placed copies of a series of e-mail communications between her and Degnan into evidence. The evidence reveals the following:

September 17, 2009: The plaintiff: "Hi Tom—just wondering f you were able to lay your hands on that Eldridge chart—and if you have a rundown for me of other items that you sold over the summer[?] Happy to hear from you when you have a chance! Thanks, DBN"

Degnan: "Hi Daphne, No I havn't located the chart. Our auction is on Oct 18, Hope to sell the rest of your things then and will have everything ready for you within a week of that sale. about a dozen items left including the secratery and share etching. hope you are well. thanks, Tom"

The plaintiff: "Okay, thanks for the info. Will you be sending the mid-September check you mentioned earlier in the summer?"

Degnan: "Daphne, No won't be sending check till October still have to do accounting for things sold over last several months and need to get all that together. i am short handed again and am under the gun to get this next sale without help. sorry for any inconvenience but promise to have everything ready for 10/25. Thanks, Tom"

October 27, 2009: The plaintiff: "Hi Tom—hoping you have an update for me—I'm eager to tie up all loose ends here. Many thanks—DBN"

Degnan: "Hi Daphne, We have some items that are not sold, We will have a check and an accounting to date in about a week. Thanks, Tom"

November 11, 2009: The plaintiff: "Hi Tom. Awaiting the check and accounting. . . . Thanks! DNB"

[4] The plaintiff's complaint alleged ten counts, five similar counts against each of the defendants. The plaintiff alleged breach of contract, unjust enrichment, conversion, negligent infliction of emotional distress, and violation of CUTPA. The court found in favor of the defendants on the breach of contract, conversion, and negligent infliction of emotional distress counts. In this appeal, we are concerned only with the court's judgment in favor of the plaintiff on the unjust enrichment and CUTPA counts.

antiques at auction, and the court found the conservative worth of the antiques to be $23,565. The plaintiff could not explain why her list did not account for all of the antiques consigned to the defendants, testifying that she had put the list together to the best of her ability. The court, nevertheless, found the plaintiff's list and valuations to be credible.

At trial, Degnan presented a list of 108 additional items he claims that he sold in January and February, 2009, for a total of $2600. According to Degnan, the list presented was an actual list of items sold at auction, in addition to the eighty-two items he previously reported as having been sold as of June, 2009. Degnan testified that he sold all of the antiques consigned to him, except for two lots that were in the trunk of his car. The court found that, although he sold all but two items the plaintiff had given him to sell, Degnan did not send the plaintiff her share of any sales after June, 2009. He explained that he could not profitably absorb the cost of shipping the large items from Martha's Vineyard, and that he had time-consuming disagreements with the plaintiff.

Moreover, the court found that Degnan sold a secretary, or desk, sometime during the first quarter of 2009, but that he had no records to document the transaction. He sold the secretary, which had a reserve value of $2000, purportedly for $500. Degnan also sold a sampler, which had a reserve value of $800, for $300. He sold a finely woven Persian rug with a reserve value of $3000, for $1300, and a scrimshaw whale bone busk, or corset stay, reserved at $800, for $400. The plaintiff denied that she agreed with Degnan's judgment to sell those items for less than their reserve values.

The court did not find credible Degnan's testimony regarding antiques sold in January and February, 2009, and that he sold all but two lots consigned to him. The

court found that the list Degnan entered into evidence contained fewer lots than the number of lots missing, no lot numbers, and the descriptions of most of the antiques did not match the lot descriptions in the contract. Moreover, the court found that Degnan's explanation as to why he sold items below the reserve values was inconsistent with his December 1, 2008 letter and that his claim regarding shipping costs was inconsistent with paragraph 6 of the contract.[5] The court also found evidence that the defendants were experiencing financial difficulties during the relevant period of time.

The court issued a memorandum of decision on February 24, 2012. The court found that the plaintiff failed to prove her breach of contract, conversion, and negligent infliction of emotional distress claims. The court found, however, that the plaintiff had proven her unjust enrichment claim and awarded her $17,673.25 in damages. The court also found that the plaintiff had proven her CUTPA claim and awarded her attorney's fees of $10,290 and costs of $892.94. The defendants appealed. Additional facts will be set forth as necessary.

I

The defendants claim that the court improperly (1) found them liable to the plaintiff for unjust enrichment and (2) awarded the plaintiff damages. We disagree.

A

The defendants claim that the court's finding that they had been unjustly enriched is clearly erroneous. "Unjust enrichment applies wherever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by

---

[5] Paragraph 6 of the contract stated: "Both parties agree that [Degnan] will pay all expenses for the promotion and execution of the sale and that no additional charges for services such as moving and or insurance will be charged to or deducted from proceeds due [the plaintiff]."

an action on the contract. . . . A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another. . . . With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary in any case where the benefit of the doctrine is claimed, to examine the circumstances and the conduct of the parties and apply this standard. . . . Unjust enrichment is, consistent with the principles of equity, a broad and flexible remedy. . . . Plaintiffs seeking recovery for unjust enrichment must *prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment.*" (Emphasis added; internal quotation marks omitted.) *Hospital of Central Connecticut* v. *Neurosurgical Associates, P.C.*, 139 Conn. App. 778, 784, 57 A.3d 794 (2012). "A determination that . . . restitution is appropriate under quantum meruit or unjust enrichment is a factual determination that may be reversed only if clearly erroneous." *BHP Land Services, LLC* v. *Seymour*, 137 Conn. App. 165, 169, 47 A.3d 950, cert. denied, 307 Conn. 927, 55 A.3d 569 (2012).

The following additional facts are relevant to our resolution of the defendants' claim. The court found that the plaintiff had failed to prove her breach of contract claim, as the contract under which she had consigned antiques to be sold at auction by the defendants terminated when the defendants sold some of those antiques on November 21, 2008, and paid the plaintiff her share of the proceeds. The defendants did not return the unsold antiques to the plaintiff or notify her of their intention to return them. The court stated that,

ordinarily, retention of unsold consigned goods converts the transaction from a consignment into a sale at the election of the consignor, i.e., the plaintiff. See *International Looms, Inc.* v. *Jono Textile Co.*, 34 Conn. Supp. 599, 602, 379 A.2d 3, cert. denied, 172 Conn. 719, 369 A.2d 1120 (1977). The court found that neither the plaintiff nor the defendants made an election, and that the plaintiff and Degnan entered into a new course of dealing roughly intending for the defendants to liquidate the unsold antiques. The manner, terms, duration, and commissions concerning the liquidation of the unsold antiques was uncertain and continuously changing. The court therefore found that the plaintiff had failed to prove that the defendants breached the consignment contract and that there was no new enforceable agreement between the parties.

The court found, however, that the plaintiff had proven that the defendants had received at least 141 antiques from her and that Degnan's explanation as to what he did with those antiques and his documentation of their sale at auction, or otherwise, was not credible. The defendants did not account for those antiques. The court found that the antiques could have fetched conservatively $23,565 at auction. Under the contract, the defendants were entitled to a commission of 25 percent. The court deducted the defendants' commission from the benefit they received by retaining and selling the antiques without paying the plaintiff her share of the proceeds. After deducting the defendants' commission, the court found the unjust benefit to the defendants to be $17,673.25.

On appeal here, the defendants claim that there was no legal basis for the court to make a finding that they had been unjustly enriched. The defendants predicate their claim on *International Looms, Inc.* v. *Jono Textile Co.*, supra, 34 Conn. Supp. 599, arguing that because the plaintiff never asked the defendants to return her

unsold antiques, their agreement did not convert from a consignment of goods to a sale of goods. See id., 602. *International Looms, Inc.*, however, is a case sounding in contract, not unjust enrichment, and therefore does not contribute to our analysis. Here, the defendants took possession of more than 200 of the plaintiff's antiques and have not accounted for 141 of them.

The plaintiff bore the burden of proving that the defendants were unjustly enriched. See *Hartford Whalers Hockey Club* v. *Uniroyal Goodrich Tire Co.*, 231 Conn. 276, 283, 649 A.2d 518 (1994). The trial court found that the plaintiff was a credible witness and that Degnan was not. Moreover, Degnan admitted that, since December, 2008, the defendants had sold all but two of the plaintiff's antiques, but failed to provide an accounting of those sales and did not pay the plaintiff her share of the proceeds of those sales.[6] Degnan used the proceeds of sales to cover the defendants' expenses. We therefore conclude that the court's findings that (1) the defendants were benefited by selling the unaccounted for antiques, (2) they unjustly failed to pay the plaintiff her share of the proceeds, and (3) their failure to pay was detrimental to the plaintiff were not clearly erroneous or contrary to law under *International Looms, Inc.*

### B

The defendants next claim that the court incorrectly calculated the damages due the plaintiff for unjust enrichment. We do not agree.

---

[6] At trial Degnan testified as follows on cross-examination by the plaintiff's counsel:

"Q. Did you ever send [the plaintiff] an account of the remaining person property?

"A. No.

"Q. Had she requested an accounting?

"A. She had. . . .

"Q. And during that time which you sold [the plaintiff's] property, but you didn't pay [her], is that correct?

"A. Correct."

The amount of damages is a question of fact for the trier of fact. See *Bhatia* v. *Debek*, 287 Conn. 397, 419, 948 A.2d 1009 (2008). "[T]he measure of damages in an unjust enrichment case ordinarily is not the loss to the plaintiff but the benefit to the defendant." *Hartford Whalers Hockey Club* v. *Uniroyal Goodrich Tire Co.*, supra, 231 Conn. 285. The defendants argue that the value of unjust enrichment is not the value of the antiques to the plaintiff, but the value of the antiques realized at sale.

The plaintiff and Degnan placed into evidence their respective lists of antiques consigned to the defendants for sale. The plaintiff provided a high and low value of the antiques in her list; the court accepted the lower value of the antiques in calculating the value of the antiques. The court did not find the defendants' lists, documentation of sales, and testimony to be credible. Appellate courts do not make credibility determinations. *Giulietti* v. *Giulietti*, 65 Conn. App. 813, 878–79, 784 A.2d 905, cert. denied, 258 Conn. 946, 947, 788 A.2d 95, 96, 97 (2001). The court's damages award was predicated on the evidence the court found credible.[7] The defendants' claim therefore fails.

## II

The defendants claim that the court improperly found that they had violated CUTPA. We disagree.

We first review the law with regard to a finding of liability under CUTPA. CUTPA "is remedial in character . . . and must be liberally construed in favor of those whom the legislature intended to benefit." (Internal quotation marks omitted.) *Eder Bros., Inc.* v. *Wine Merchants of Connecticut, Inc.*, 275 Conn. 363, 379, 880 A.2d 138 (2005). "The operative provision of [CUTPA],

---

[7] In their brief, regarding their CUTPA claim, the defendants acknowledge that the court found that their exhibits lacked credibility.

§ 42-110b (a), states merely that [n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. Trade or commerce, in turn, is broadly defined as the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, person or mixed, and any other article, commodity, or thing of value in this state. . . . The purpose of CUTPA is to protect the public from unfair practices in the conduct of any trade or commerce, and whether a practice is unfair depends upon the finding of a violation of an identifiable public policy. . . . A CUTPA claim may be brought in the Superior Court by [a]ny person who suffers an ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b . . . ." (Citations omitted; internal quotation marks omitted.) Id., 380.

"It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." (Footnote omitted; internal quotation marks omitted.) *Hartford Electric*

*Supply Co.* v. *Allen-Bradley Co.*, 250 Conn. 334, 367–68, 736 A.2d 824 (1999).

In this case, the court found that the defendants retained the plaintiff's antiques and that Degnan led her to believe that he was attempting to liquidate them. The defendants, however, never produced an accounting or an explanation as to the disposition of 141 antiques and produced only excuses until the plaintiff commenced this action. Thereafter, the court found that the defendants' explanations and purported documentary proof of disposition lacked credibility. The court concluded that as of the end of trial, the defendants had failed to account for the plaintiff's property. The court reasoned that although a simple breach of contract or an act of carelessness would not result in CUTPA liability, in this case, the defendants left "a trail of deceit and deception" in addition to mishandling the plaintiff's antiques.[8]

On appeal, the defendants argue that they did not breach the consignment agreement, as they offered the plaintiff's antiques at auction in November, 2008. The court found that the defendants offered the plaintiff's antiques at that time and accounted for the antiques that were then sold. The issue is what the defendants did with the plaintiff's antiques that were not sold at that auction. The defendants have not accounted for them, and although Degnan testified that he sold all but two of the antiques, he never paid the plaintiff her share of the proceeds of sale.

The defendants also argue that because the court found that their inability to account for all of the consigned antiques was due "to poor record keeping and economic distress," such conduct does not rise to a violation of CUTPA. We agree that mere negligence is not evidence of a CUTPA violation, but in this case, the

---

[8] The court did not award the plaintiff damages because it had awarded her damages pursuant to her unjust enrichment claim.

court explicitly found that the defendants engaged in *deceitful and deceptive conduct.* "[A] violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy. . . . Furthermore, a party need not prove an intent to deceive to prevail under CUTPA." (Citations omitted; internal quotation marks omitted.) *Cheshire Mortgage Service, Inc.* v. *Montes,* 223 Conn. 80, 106, 612 A.2d 1130 (1992).

In crafting their argument on appeal, the defendants have taken the court's finding out of context and misconstrued it.[9] The issue is not the conduct that led to the defendants' inability to account for 141 antiques belonging to the plaintiff, but that Degnan's having deceived the plaintiff as to the antiques in his possession, and his excuses and unfulfilled promises to pay constitute the CUTPA violation. We conclude, on the basis of our review of the record and the court's memorandum of decision, that the court found that the defendants' deceitful behavior constituted a violation of CUTPA. The court's finding was not improper.

III

The defendants' last claim is that the court's award of attorney's fees was improper. We do not agree.

---

[9] The language on which the defendants rely was used by the court to explain why it did not award the plaintiff punitive damages. "In order to award punitive or exemplary damages, evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights. . . . [A]warding punitive damages . . . under CUTPA is discretionary . . . ." (Internal quotation marks omitted.) *Thorsen* v. *Durkin Development, LLC,* 129 Conn. App. 68, 76–77, 20 A.3d 707 (2011). The court stated in its memorandum of decision, "Pursuant to the applicable legal tests, the court declines to issue [punitive damages] in this case. The court attributes the defendants' conduct to poor record keeping and economic distress. Also, the damages and attorney's fees and costs being awarded will sufficiently remedy the wrong committed and compensates the plaintiff for her costs of litigation in this case."

We see no inherent inconsistency between the court's concluding that the defendants "left a trail of deceit and deception" for CUTPA purposes, and the court's conclusion, for purposes of evaluating an award of punitive

The following facts are relevant to the defendants' claim. The court held a posttrial hearing on June 4, 2012. The court reviewed the plaintiff's evidence as to costs and attorney's fees as to their nature, extent and reasonableness.[10] The plaintiff's counsel charged $210 per hour, and he expended forty-nine hours on the plaintiff's case. The court found the rate was reasonable, that the forty-nine hours of time expended were necessary and reasonable, and awarded the plaintiff $10,290 in attorney's fees and $892.94 in costs.

Here, as they did at trial, the defendants object to the amount of attorney's fees awarded, arguing that the plaintiff was successful in only four of the ten counts alleged in her complaint. The court ruled, however, that it was not necessary to apportion attorney's fees, as all of the claims alleged by the plaintiff were related to and dependent on the same facts, i.e., the defendants' conduct in failing to return or to credibly account for most of the plaintiff's antiques consigned to them. We agree with the court.

"[W]e review an award of attorney's fees under the abuse of discretion standard of review. This standard applies to the amount of fees awarded . . . and also to the trial court's determination of the factual predicate justifying the award. . . . Under the abuse of discretion standard of review, [w]e will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did." (Internal quotation marks

damages, that the defendants' inability to *account* for all of the consigned antiques was due to "poor record keeping and economic distress."

[10] The court reviewed the plaintiff's motion for attorney's fees, counsel's affidavit and itemized billing records.

omitted.) *Moasser* v. *Becker*, 121 Conn. App. 593, 595, 996 A.2d 1200 (2010).

The defendants' claim is controlled by this court's decision in *Heller* v. *D. W. Fish Realty Co.*, 93 Conn. App. 727, 890 A.2d 113 (2006). In *Heller*, the plaintiffs purchased a home with the assistance of the defendant real estate agency. Id., 729. The contract of sale contained a water well contingency rider. To resolve the contingency, an agent of the defendant real estate agency undertook to have the well inspected. Id. Following a home inspection, the agent informed the plaintiffs that the well functioned properly. Id. Several weeks after moving into their new home, the plaintiffs encountered a problem with the quality of their well water and discovered dead rodents in their well. Id. The plaintiffs were required to dig a new well. Id. The plaintiffs learned that the inspector hired by the agent was not qualified to inspect the well, which contained holes used by the rodents to enter the well. Id., 730. The plaintiffs commenced an action against the defendant real estate agency and its agent sounding in breach of contract, negligence, and CUTPA violation. Id. The jury found in favor of the plaintiffs on all counts. Id. Although the plaintiffs prevailed, the court declined to award the plaintiffs attorney's fees because they could not apportion the amount of time counsel spent on the CUTPA claim. Id., 735. The court relied on *Jacques All Trades Corp.* v. *Brown*, 57 Conn. App. 189, 752 A.2d 1098 (2000), in reaching its decision. The plaintiffs appealed to this court.

In reversing the judgment denying the attorney's fees in *Heller*, this court distinguished cases in which the factual basis of a CUTPA claim is integral to or separate from the facts underlying other causes of action alleged and tried. This court stated that *Jacques All Trades Corp.* "involved protracted litigation concerning two different contracts. The trial court in that case awarded the named defendant $19,413.50 in attorney's fees

related to her CUTPA counterclaim in regard to one of the contracts. . . . On cross appeal, the named defendant claimed that the court should have awarded her $53,605.50 in attorney's fees incurred in the defense of the entire litigation. . . . In rejecting that claim, we stated that [General Statutes] § 42-110g (d) relates solely to claims related to the prosecution of a CUTPA claim and not to all claims. . . . Because the named defendant's CUTPA counterclaim related only to one of the two contracts involved in the parties' lengthy litigation, we determined that the court properly awarded her $19,413.50 in attorney's fees rather than $53,605.50. . . .

"In [*Heller*], the plaintiffs' breach of contract and negligence claims were related to their CUTPA claim because they depended on the same facts. As we stated in *Jacques All Trades Corp.*, § 42-110g (d) encompasses claims related to the prosecution of a CUTPA claim . . . not only one claim explicitly labeled as a CUTPA claim. The court therefore should not have ordered the plaintiffs to submit evidence apportioning their attorney's fees among their claims." (Citations omitted; internal quotation marks omitted.) *Heller* v. *D. W. Fish Realty Co.*, supra, 93 Conn. App. 735–36; see also *Total Recycling Services of Connecticut, Inc.* v. *Connecticut Oil Recycling Services, LLC*, 308 Conn. 312, 325–33, 63 A.3d 896 (2013) (when certain claims provide for recovery of contractual attorney's fees but others do not, party nevertheless entitled to full recovery of reasonable attorney's fees if apportionment impracticable because claims arise from common factual nucleus and are intertwined). We therefore conclude that the court's award of attorney's fees in this case was proper because the same facts were relevant to all counts of the plaintiff's complaint.

The judgment is affirmed.

In this opinion the other judges concurred.